AnnualPAUL, REICH & MYERS, P.C.
By:    Robert E. Paul, Esquire
Identification No. 21252
1608 Walnut Street, Suite 500                    Attorney for Plaintiff
Philadelphia, PA 19103
(215) 735-9200

---

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
CIVIL SECTION:    TRIAL DIVISION

---

| | | |
|---|---|---|
| CALVIN DAMON and | : | CIVIL ACTION |
| ROSEANNE DAMON, h/w | : | |
| | : | |
| vs. | : | NO. 14-CV-1954 |
| | : | |
| AIREON MANUFACTURING CORP., et al. | : | ASBESTOS CASE |

---

**ANSWER TO MOTION FOR SUMMARY JUDGMENT OF RAYTHEON**

Defendant has failed in its burden on summary judgment.  Its motion should be denied.


PAUL, REICH & MYERS, P.C.

BY: _____
ROBERT E. PAUL

PAUL, REICH & MYERS, P.C.
By:   Robert E. Paul, Esquire
Identification No. 21252
1608 Walnut Street, Suite 500                    Attorney for Plaintiff
Philadelphia, PA 19103
(215) 735-9200

---

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
CIVIL SECTION:   TRIAL DIVISION

---

| CALVIN DAMON and | : | CIVIL ACTION |
| ROSEANNE DAMON, h/w | : | |
| | : | |
| vs. | : | NO. 14-CV-1954 |
| | : | |
| AIREON MANUFACTURING CORP., et al. | : | ASBESTOS CASE |

---

**MEMORANDUM IN OPPOSITION TO
MOTION FOR SUMMARY JUDGMENT OF RAYTHEON**

**I.     SUMMARY OF FACTS AND LEGAL ISSUES**

Plaintiff was exposed to and inhaled asbestos dust when he opened up Raytheon radar

equipment.  The Raytheon equipment contained asbestos.  When the case was removed to this

Court on a defense to state court claims and perhaps became a maritime case still plaintiff

retained his state law rights.  The government contract defense is for a jury to resolve as the

Court has previously ruled in this case.  Defendant is liable in strict liability as there is no

evidence the asbestos in the Raytheon equipment to which he was exposed was not the original.

Under his Pennsylvania law claims he should be permitted to proceed.  On the maritime claim in

negligence he should be permitted to proceed against Raytheon for designing its equipment to

contain asbestos.

## II.   ACTUAL FACTS OF CASE

Damon's jobs in the Navy required him to work with radar and/or sonar equipment. (Exhibit A, 272-302). He worked with Raytheon radar sets. These pieces of equipment were located in what he called the ECM room (November 18, 2014 deposition Exhibit C NT 115). He had described the ECM room in the prior deposition as the electronic counter measures room (April 4 transcript 74). In the April 17, 2014 deposition he described exposure to dust from Raytheon products (Exhibit A, 271-303, especially 283-289). This included seeing dust on Raytheon gaskets he repaired. (284-295). The Raytheon components were the same on both ships (296-297). He took apart the gaskets from the Raytheon scope. In the April video (Exhibit B) he further described coating and gasket exposure dust from Raytheon products (37-46, 61). He worked on every piece of equipment in the command centers (116). He described how he removed the front cover and would remove the dust which had accumulated throughout the Raytheon product. (119, 121). His job required him to clean and dust out the unit (121). There is no evidence that these were not original equipment gaskets and coating and seals. This included[1] packing and seals which were frayed from the heat (Exhibit C 63, 114-126, 151-152). Raytheon had sold a radar set AN/SPN-12 (XN-1)(Exhibit D). This was the product which he opened up as described above. The AN/SPN-12 (XN-1) was the product used on the USS Independence CVA-62 (Exhibit E), see page 3-1-1. This contained packing[2] described by

---

[1] Counsel for Raytheon objected to some of the testimony but not all. Counsel for Lockheed believed it was his obligation to object to every question.

[2] All high heat packing contained asbestos at that time (Exhibit K, Jewitt testimony)

3

Damon, see page 3-17 and seal with asbestos compound. Contained within the Raytheon product were asbestos products labeled seals and packing. A packing is a sealing type product. Faherty discusses the role asbestos sealing gaskets and wire played in Damon's injury (Exhibit F). Bendix/Honeywell's expert McCaffery had located the Navy documents that showed asbestos gaskets, board sealing compound and wire were used on ships during Damon's service (Exhibit G).

Despite Raytheon's attempts to recast the evidence the fact remains that he was exposed to asbestos dust emitted from Raytheon products from packing and seals designed and intended by Raytheon. Based on the evidence it was the first time the asbestos products were removed since their original installation since he noted over 15 years had passed since the last renewal (Exhibit C, NT 120).

Plaintiff's maritime expert will testify that some of the original equipment asbestos never left the products (Exhibit F, Faherty) and that the Navy required warnings and that Damon was exposed to asbestos from gaskets and wire. Dr. Frank stated he would testify based as to the role of each defendant compared to the totality of the exposure. (Exhibit H). While he did not write a 40 page opus describing the role of each defendant in the total picture, he stated he intended to discuss the role of each defendant based on the description of their role derived from the deposition and would discuss the history of knowledge of the hazards of asbestos (Exhibit I). Raytheon's founder was an MIT professor so it could easily have known of the hazards of asbestos (Exhibit J). Raytheon can hardly claim it is unaware of the evidence of exposure in the case.

III. **LEGAL ISSUES**

4

### A. State Law Claims remain and the Court lacks Jurisdiction and Negligence and Strict Liability Claims under Pennsylvania and Maritime Law exist

It is plaintiff's contention that maritime law does not apply herein. It is to be remembered that maritime jurisdiction is limited see 28 U.S.C. 1333 (1). The section provides original but not exclusive jurisdiction to federal courts, saving to suitors in all cases all other remedies to which they are otherwise entitled. This Court has recognized this statute in such cases as *McKenna* 14-CV-6064 in which defendants sought to remove a case on the grounds of maritime jurisdiction. Relying on cases such as *James Lewis v. Lewis and Clark Marine*, 531 U.S. 438 (2001) this Court remanded on the grounds that state courts retain power over certain classes of cases. While This Court has chosen to exercise its pendent jurisdiction power to retain cases the state law claims remain to be tried alongside the maritime claims by the Court. Also see *Madruga v. Superior Court of California*, 346 U.S. 556 (1934).

Thus, the negligence claim against Raytheon under both state and federal law remains valid. This claim provides that if defendant designed its product to contain asbestos and failed to warn it remains liable for injuries caused by its product. This Court recognized such claims in *Schwartz v. Abex*, 2015 U.S. Dist Lexis 6807 (USDCEDPA 2015), under state law and in maritime in cases such as *Salisbury* 2014 U.S. Dist Lexis 11295 (USDCEDPA 2014). Other Courts have interpreted *Salisbury* as allowing plaintiff to proceed on negligence even when the strict liability claim fails see *Quirin v. Lorillard*, 17 F. Supp 3.d 760 (USDCNDILL 2014). Raytheon knew, should or could have known that asbestos was hazardous. As Dr. Frank notes in his affidavit the knowledge that asbestos was hazardous was widespread throughout the scientific community for many years (Exhibit I). Raytheon's founder was later dean of MIT's School of

Engineering (Exhibit J). Thus Raytheon had easy access from the beginning to all the scientific knowledge discussed by Dr. Frank. It should have acted to prevent injury in its designs and warn but failed to do either. Thus, under either maritime or state law it breached its duty to warn. On negligence whether in maritime or state law Restatement of Torts 2nd 388 provides that a defendant can be held liable if it knew or should have known of the hazards *Gresik v. PA Partners LP*, 33 A.3d 594 (Pa. 2011) (Pennsylvania) *Norfolk Shipbuilding & Drydock v. Garris*, 532 US 811 (2000), *Fisher v. Foster Wheeler*, 994 F. Supp 2.d 679 (ED PA 2014), *East River Steam Ship v. Transamerica DeLaval*, 476 U.S. 858 (1986), *Kermarec v. Compagnie Transatlantique* 358 U.S. 625 (1939)(Maritime). The Court, in denying plaintiff's motion to remand herein stated that plaintiff had created a jury question on the government contractors/specification defense.

On the government specifications defense Raytheon proffers no support for its claims. By contrast plaintiff, through his expert, Faherty (Exhibit F) relies on specific Navy requirements for warnings which Raytheon failed to obey. At least one Court has rejected Raytheon's defenses on this point. See *Hilbert v. McDonnell Douglas*, 07 CV 11900(USDCMASS 2008). This Court in denying plaintiff's motion for summary judgment in *Carper* and motion to remand in this case specifically ruled that a jury question existed on the issue of government specifications.

As to strict liability under maritime the Court's views are clear although erroneous and contrary to the requirements to protect seamen see *Moragne v. State Marine Lines*, 398 U.S. 375 (1970) discussion by Circuit Judge, Later Supreme Court Justice Story in *Hurden v. Gordon,* 111 F. Case 480 (D Maine 1823).

As to the state law the Court, in its *Schwartz* opinion rejected its own ruling in *Hoffeditz*

2011 U.S. Dist Lexis 110282 (USDCEDPA) and ignored the holding of *Burbage v. Boiler Engineering*, 249 A.2d 563 (1969) .In that case the Supreme Court of Pennsylvania reviewed a case similar to this one. In *Burbage* a valve had been replaced on a boiler. The replacement valve which was not supplied by the boiler defendant malfunctioned caused injury. The Supreme Court upheld plaintiff's verdict against the boiler company on the grounds that from plaintiff's perspective it was defendant's boiler. The Court's *Schwartz* opinion disregards *Burbage* and should be rethought in light of *Burbage*. It still allows the negligence claim to proceed. Bare metal is not a recognized defense in negligence in any event. Raytheon could have known of the hazards yet failed to warn despite the Navy's. The motion should be denied.

PAUL, REICH & MYERS, P.C.

BY: _Robert E. Paul_

ROBERT E. PAUL

| | | |
|---|---|---|
| CALVIN DAMON and ROSEANNE DAMON, h/w | : | CIVIL ACTION |
| | : | |
| vs. | : | NO. 14-CV-1954 |
| | : | |
| AIREON MANUFACTURING CORP., et al. | : | ASBESTOS CASE |

## ORDER

**AND NOW**, to wit, this _____ day of _____, 2015, the Answer to

Motion for Summary Judgment of **Raytheon** is hereby **Denied**.

BY THE COURT:


_____ J.

# CERTIFICATE OF SERVICE

I, Robert E. Paul, Esquire, hereby certify that a true and correct copy of Plaintiff's Answer to Motion of Raytheon has been filed electronically. This document is available for viewing and downloading from the ECF system as was served upon all counsel of record.

_Robert E. Paul_
Robert E. Paul

Date: _August 14_, 2015

# EXHIBIT A

866.MAGNA21

Graphic Consulting
Trial Presentation

LEGAL SERVICES

Subpoena Services
Document Management

www.MagnaLS.com

IN THE COURT OF COMMON PLEAS
OF PHILADELPHIA COUNTY
CIVIL SECTION:  TRIAL DIVISION



- - -

CALVIN DAMON and          :  FEBRUARY TERM, 2014
ROSEANNE DAMON, h/w       :
                          :
        vs.               :
                          :
AIREON MANUFACTURING      :
CORP., et al.             :  NO. 2955

- - -

FRIDAY, APRIL 4, 2014

VOLUME I

- - -

Oral deposition of CALVIN
DAMON, was held at the Hotel Fauchere, 401
Broad Street, Milford, Pennsylvania,
commencing at 9:34 a.m., on the above date,
before Deborah A. Brazukas, a Registered
Professional Reporter, Certified Shorthand
Reporter of New Jersey, License No. XI 01938,
and Notary Public.

MAGNA LEGAL SERVICES
(866) 624-6221
www.MagnaLS.com



... scopes and the ECM equipment and
... erent things.

So I -- I -- I don't know if
... answering what the question -- how you
... -- you know, I have to answer it the way
... can. I can't --

... And I appreciate that. And
... e doing fine.

What -- you mentioned ECM
... ment. What is that?

... Electronic countermeasures.

... While you were on the Lake
... plain, did you actually operate any of
... dar equipment?

... Yes, I did.

... Do you recall about when you
... operating the equipment?

... Probably -- I think -- I believe
... st of '64 is our first deployment out to

What type of work did you do,
... ally speaking, to operate the radar
... ment?

You would sit in front of the
... cope and track paints or -- they call
... lips or paints on the scope. And that
... indicate the direction of the fleet,
... her vehicle -- any other vessels that
... pproaching or that would have a impact
... fleet.

Okay. You also indicated you
... clean some of this machinery?

... Yes.

What type of -- what machinery
... referring to?

In the very beginning, I would
... the -- we'd call it a pomsey brush.
... like a paintbrush. It was about an
... und thick brush, and we used to -- my
... ause I couldn't touch anything, was
... this out and cleaning it out. And
... e -- your E-6s or E-7s that were --
... work on it until they taught me what to
... I was cleaning the machinery inside,
... the -- the front jackets of the --
... y, I don't -- front door of the
... orking in the --

---

2   have the answer read back, please.
3        (Whereupon, the court reporter
4        read back the record as requested.)
5   BY MS. McCORMACK:
6        Q.   Where was this machinery located
7   on the ship?
8        A.   There was -- there was -- major
9   part of the machinery that I just talked
10  about was in the CIC room, combat room, CIC.
11       Q.   Okay. Were there parts of the
12  radar system that were somewhere other than
13  the combat -- or the CIC room?
14       A.   There was -- yes, there were
15  the -- the power supply was in a different
16  area, adjacent to the CIC room. Then there
17  was some component areas one deck above the
18  CIC room.
19       Q.   Was there anything else in the
20  CIC room besides the radar equipment?
21       A.   Status boards, DRT tables.
22       Q.   Are you able to estimate for me
23  how big the CIC room was on the Champlain?
24       A.   Forty by 40, 40 by 30.

1        Q.   Is that your best estimate at
2   this point?
3        A.   Yes.
4        Q.   Do you recall the manufacturer of
5   any of the radar equipment on the Champlain?
6        A.   There was so many things that I
7   was learning as -- I was 17 years old. It
8   was the first time out of the house. So
9   everything was a new experience. There were
10  things that you would see that I've never
11  seen before. And I remember there was tubes,
12  and I remember Philco tubes, I remember
13  Westinghouse. I remember --
14       DEFENSE COUNSEL: Can we have
15  the answer read back, please.
16       MS. McCORMACK: Can he finish
17  his answer first, please.
18       Go ahead, sir.
19       DEFENSE COUNSEL: We're losing
20  audio, just so that you guys know.
21  BY MS. McCORMACK:
22       Q.   Okay. Can you finish your
23  answer, sir?
24       A.   There was the -- Philco I believe




COPY

866.MAGNA21

Graphic Consulting    Trial Presentation

LEGAL SERVICES

Court Reporting
Subpoena Services
Document Management

www.MagnaLS.com

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

CALVIN DAMON and          :
ROSEANNE DAMON, h/w       :
                          :
        vs.               :
                          :
                          :
AIREON MANUFACTURING      :
CORP., et al.             :   NO. 14-cv-01954-ER

- - -

THURSDAY, APRIL 17, 2014

VOLUME II

- - -

        Continued oral deposition of

CALVIN DAMON, was held at the Hotel Fauchere,

401 Broad Street, Milford, Pennsylvania,

commencing at 10:32 a.m., on the above date,

before Deborah A. Brazukas, a Registered

Professional Reporter, Certified Shorthand

Reporter of New Jersey, License No. XI 01938,

and Notary Public.

MAGNA LEGAL SERVICES
(866) 624-6221
www.MagnaLS.com



lacking foundation as speculation.

BY MR. SMITH:

Q. Sir, you bring up a really good point. We're asking you questions about things that happened many, many, many years ago. And I think I heard you say that you weren't sure what -- the answer I was looking for. I'm not looking for a particular answer. I just need to ask questions and find out what your memory is.

A. Yeah.

Q. So if you don't remember, that's fine. If I ask for an estimate and you say you can't think of one that's reasonable in your head --

A. Right.

Q. -- then please don't give me one. Because we definitely don't want you to speculate, you know, and try to guess. We just want to figure out what you remember.

A. Yeah.

MR. PRESENT: Objection. This was all explained to him at the very beginning of the deposition. You were

present for that instruction that was given by Carolyn McCormack. So I object to the repetitious nature of this. This is unnecessarily prolonging this deposition and costing all these different clients a lot more money.

MR. SMITH: Well, counsel, if you heard my objection, what I said was -- he said to me, what is the answer that I was looking for. Now, that says to me the he did not understand the first instruction, so I'm just repeating that.

MR. PRESENT: Well, that doesn't mean he doesn't remember. That means he doesn't understand. But I can understand why he doesn't understand your questions, because some of them are difficult for me to understand, and I'm a lawyer.

MR. SMITH: Sounds good.

BY MR. SMITH:

Q. What I'm -- but basically the point I was trying to make is we're just trying -- I'm not -- there is no answer that

1  I'm looking for. I just want you to tell me
2  what you recall or what you know. That's
3  all.
4      Okay. So --
5      MR. PRESENT: I object to that
6  as well, because I think you're looking
7  for an answer that helps you.
8      MR. SMITH: Well, I'm looking
9  for an answer that would be his best
10  estimate. Now, if he doesn't have that
11  answer, then I'll move on. And I'm
12  moving on.
13  BY MR. SMITH:
14      Q. Sir, when you -- when you were
15  operating a radar --
16      A. Yes.
17      Q. -- you only came in contact with
18  metal and plastic and rubber. Is there any
19  other materials that you can think of?
20      A. No. That's basically it.
21      Q. Okay.
22      A. You know, cop -- you know,
23  basically the internal part of the machine.
24      Q. Let's leave that aside. I'm

1  talking about just the actual sitting down on
2  the radar screen and doing the functions --
3      A. Metal box.
4      Q. -- of the CIC.
5      A. Metal box.
6      Q. Okay. And another thing that we
7  have to be careful of is speaking over each
8  other, because the court reporter can only
9  type one of us at one time.
10     So a metal box. And then if I
11  heard you right, you said the work that --
12  the items that you would work on were the
13  scopes, the ECM, you did work in the
14  auxiliary room where the big boards were
15  powered from?
16     A. Right.
17     Q. You worked on the radar in the
18  front coms?
19     A. Right. Con.
20     Q. What?
21     A. Con. Con, not com.
22     Q. Con, okay.
23     And then -- and then I think I
24  heard you say on con on level -- well, strike

1   Q.   Were these done through A to Z
2  or --
3   A.   Yes.
4   Q.   -- did you do them on your own?
5   A.   I would -- I think Tiffany's was
6  done through A to Z. And Cheryl's was done
7  through Homes of Distinction, part of Homes
8  of Distinction.
9   Q.   Would -- before the homes were
10  constructed, were these empty lots or was
11  there --
12   A.   Yes.
13   Q.   -- a property -- or was there a
14  building on there that needed to be torn
15  down?
16   A.   Empty lots.
17   Q.   Okay. Were you present for the
18  construction of either Cheryl or Tiffany's
19  home?
20   A.   Yes, I was.
21   Q.   Were you exposed to
22  asbestos-containing products during the
23  construction of either Cheryl or Tiffany's
24  home?

1   A.   No.
2   Q.   I want to talk to you about one
3  of the documents that you referenced during
4  the first day of your deposition that you had
5  said you had looked at, which was the caption
6  of the Complaint.
7   A.   If that's what you call it, yes.
8   Q.   And I'll just briefly show you my
9  copy, so in all fairness you have a copy in
10  front of you.
11        And I don't know that there's
12  that much for you to read on here. But just
13  so you know what document I'm talking about.
14        MR. PRESENT: Has that been
15  marked Exhibit 1?
16        Okay, good.
17        THE WITNESS: Yes. It looks
18  familiar.
19  BY MS. McCORMACK:
20   Q.   Okay. I'm just going to ask you
21  a couple questions about that.
22   A.   Okay.
23   Q.   Do you recall when you first saw
24  that?

1   A.   I think the morning that I came
2  here or the night before. I'm not sure.
3   Q.   Okay. And had you gone through
4  and initialed a couple companies on there?
5   A.   Yes.
6   Q.   Why did you do that?
7   A.   Well, some -- some of the names
8  that -- I remember. And some of the names,
9  when I was looking at that, were the names
10  that popped back out of my mind. And -- and
11  I don't know who's going to object or who's
12  not --
13        MR. PRESENT: Don't worry about
14  that. Just tell them.
15        THE WITNESS: I don't care.
16        MR. PRESENT: Just answer the
17  question.
18        THE WITNESS: When I -- I left
19  high school, I was not that educated.
20  The only thing I was able to do was
21  communicate somewhat. Certain names, I
22  couldn't even pronounce. I couldn't -- I
23  didn't know how to pronounce them. So
24  certain names stuck into my head and into

1  my mind.
2        So when I was reviewing the
3  list, certain names came back that I
4  remember that -- you know, that I could
5  pronounce or that I was able to.
6        MS. McCORMACK: Okay.
7        THE WITNESS: So that's why
8  they jogged my mind.
9  BY MS. McCORMACK:
10   Q.   Okay. And I'm going to ask you
11  about one of the companies on there. One of
12  the companies that you initialed was Raytheon
13  Company?
14   A.   Yes.
15   Q.   Did you only -- tell me why you
16  initialed that name.
17   A.   Because that's a name that was so
18  unknown to me. So when I was in the service,
19  that was a name that I wanted to -- I saw and
20  it stuck out in my mind.
21   Q.   Are you able to associate that
22  name with any ship that you were on?
23   A.   The Lake Champlain would be
24  the...

1    Q.   Are you able to associate that
2  name with any product?
3    A.   I -- I saw it in a -- the housing
4  of the scope, of the radarscope, I believe.
5    Q.   Okay. I'm just going to follow
6  up on that. You said I believe. Do you know
7  if you saw it in the scope of the radar, the
8  housing of the radarscope? Do you --
9    A.   I believe -- I have to say I
10  believe that's where I saw it or in -- in one
11  of the components of the ECM room, which we
12  spoke about.
13    Q.   Do you know which component?
14    A.   I'm trying to take my mind back
15  to those years.
16        No, I can't. I can't exactly
17  put -- pinpoint which component.
18    Q.   All right. Now, I just -- I
19  missed this. I just want to clarify to follow
20  Do you think it was in the radarscope or the
21  component of the ECM room or both or you're
22  just not sure?
23    A.   I'm not sure. I just know that's
24  one of the names I remember.

1    Q.   Okay. Since you recognize the
2  name, but you can't necessarily associate it
3  with a particular product, would you agree
4  with me that you cannot associate any of your
5  exposure to asbestos-containing products with
6  Raytheon?
7        MR. PRESENT: Objection.
8        But you can answer.
9        THE WITNESS: I'm not exactly
10  sure what your question is.
11  BY MS. McCORMACK:
12    Q.   Okay. I can repeat it. Thank
13  you for letting me know.
14        You told me you know the name
15  Raytheon, correct?
16    A.   Yes.
17    Q.   You're not sure what product you
18  associate the name with, correct?
19    A.   Yes, I'm not a hundred percent
20  positive.
21    Q.   And since you're not sure what
22  the product is, you can't tell me if that
23  product contained asbestos, correct?
24        MR. PRESENT: Objection.

1        But you can answer.
2        THE WITNESS: I -- I don't know
3  every product that I was exposed to had
4  or had not asbestos. I am quite
5  confident that most of the materials used
6  aboard a lake -- the Lake Champlain or
7  any other ship manufactured in the '40s
8  had asbestos. And most of the products
9  that were to prevent heat loss or control
10  heat had asbestos in them. I believe the
11  Raytheon was on a -- the back of the unit
12  when they took it apart. To tell you
13  exactly where it was, I could not.
14        MS. RIECHELSON: Move to strike
15  the nonresponsive portions.
16        MR. KATTNER: Speculative; lack
17  of foundation.
18        MR. SMITH: Yes.
19        MR. PRESENT: Don't worry about
20  what they're saying. Just answer the
21  questions.
22  BY MS. McCORMACK:
23    Q.   Did you take this piece of
24  equipment apart, or did someone around you do

1  that?
2    A.   As an E-4, we were able to
3  completely disassemble the equipment. As an
4  E-3, we were learning how. So as an E-3 and
5  E-4, I was around the scopes and the -- well,
6  I wasn't in the ECM room until I was an E-4,
7  but -- so yes.
8    Q.   Okay. You said you thought you
9  may have seen the name Raytheon on the back
10  of the unit. How was -- how did the name
11  appear?
12    A.   How did it appear? It would have
13  to be printed on it somewhere for me to
14  recognize the name or -- that -- that would
15  be it. I'd have to say that.
16    Q.   Do you recall if it was directly
17  printed on the equipment itself, or if it was on
18  a name plate, if it was on a sticker or
19  anything of that nature?
20    A.   I'm not sure. Because I remember
21  asking one of the guys I was with how to
22  pronounce it. So I'm -- it was written
23  somewhere, but I can't tell you where.
24    Q.   Do you recall who you asked how

1   to pronounce the name?
2     A.   I think it was John Greer. We
3   used to call him Rosie.
4     Q.   I'm sorry, what was his last
5   name?
6     A.   Greer.
7     Q.   Thank you. That should have been
8   clear to me.
9         MR. PRESENT: That's G-R-E-E-R,
10   Greer.
11   BY MS. McCORMACK:
12     Q.   Were you around this equipment
13   just one time when it was being taken apart
14   to the best of your --
15     A.   I know you have to answer -- ask
16   these questions. Every time we took apart
17   equipment. And we serviced equipment at
18   least once a month. So I -- that's the best
19   answer I could give you.
20     Q.   Did you ever see any manuals from
21   Raytheon for this component part?
22     A.   No.
23     Q.   Did you ever see anything for
24   this component part specifying the use of

1   asbestos-containing products?
2     A.   No.
3     Q.   Did you ever speak with anyone
4   from Raytheon?
5     A.   (The witness shakes head.)
6     Q.   Is that a no?
7     A.   No. Unless they were in
8   disguise.
9     Q.   Do you have any reason to believe
10   they were there in disguise?
11     A.   No.
12     Q.   And any repairs done to this
13   equipment were done under the direction of
14   your superior officers, correct?
15     A.   Repeat the question.
16     Q.   Absolutely.
17         Any repairs or maintenance you
18   would have done to this component part, they
19   were done under the direction of your
20   superior officers, correct?
21     A.   Petty officers, not officers.
22   They were higher ranking enlisted men.
23     Q.   And these repairs or replacements
24   were done according to Navy specifications?

1     A.   Yes.
2     Q.   Any replacement parts were -- did
3   you just obtain them from the Naval
4   storeroom?
5     A.   Yes.
6     Q.   Did you personally ever order any
7   materials from Raytheon?
8     A.   No.
9     Q.   Okay. Were all these repairs
10   done or this maintenance done while you were
11   out at sea? And I'm talking particular to
12   the -- what you believe to be the Raytheon
13   equipment.
14     A.   Repairs were done when we were in
15   port, you know, when -- we normally didn't
16   operate an exercise more than 30 days. I
17   think the longest exercise we operated was 45
18   days. So the maintenance on most of the
19   equipment was done on a 30-day cycle. Scope
20   one, scope two, scope three, scope four,
21   whatever had to be done, had to be done. But
22   it was normally done on a 30-day cycle. So
23   to answer your question, at sea, we were not
24   at our home port in Quonset Point, Rhode

1   Island. We were deployed from that point.
2   So any point after that -- leaving Quonset
3   Point was at sea. But we were not at our
4   home port. And I think I -- hopefully I'm
5   answering your question correctly.
6     Q.   You are. But don't worry about
7   whether you're making me happy with the -- if
8   it's the answer I'm looking for.
9     A.   I'm not trying to make you happy.
10   I'm trying to answer your question.
11     Q.   Do you associate any product
12   number or any designation with this Raytheon
13   component part?
14     A.   No.
15     Q.   And I'm just going to ask you,
16   just because we've been talking about it a
17   little bit, do you have any recollection now
18   as to what component part it may have been
19   that you associate with Raytheon?
20     A.   Unless I sat down and really
21   tried to pull apart a scope for -- I couldn't
22   tell you. I'd have to sit and try to go over
23   what I did and -- and everything. And I
24   really can't. I don't -- unless you want to

## Page 280

e in a trance. No.
No. We're not trying to do that
. I figured since we were jogging your
ry, I would take another shot, but --
I'm trying to go through
nt items in my head.
MS. McCORMACK: All right.
Damon, I'm going to take a look at my
es. I think right now those may be
questions I have. I will take a look
ny notes. And if I have anything
, I will ask you. I will come back
to ask you some more questions about
r medical history after everyone else
had an opportunity to ask you some
stions.
THE WITNESS: Okay.
MS. McCORMACK: Thank you very
h for your time.
MR. PRESENT: I have a couple
stions I'm going to ask just on one
e. But I'm going to do that not now
when you're done. Do you need a
s of water or are you good?

## Page 281

THE WITNESS: I'm good.
- - -
EXAMINATION
- - -
. PRESENT:
Anyway, can you hear me okay?
Yes, I can.
All right. I just want to focus
time on the ships, on the
dence and the Champlain.
Yes.
With respect to your time on both
ships -- and I think this has
been gone over, but I just want to
cene a little bit. And hopefully no
object to this, since it's been
ed fairly conclusively. But would
rect that most of your time on both
ships was spent in the radar room
u were working? Is that correct?
MS. McCORMACK: Objection to

THE WITNESS: When I was
ing, yes.

## Page 282

1    BY MR. PRESENT:
2        Q.   Okay. Just as a general idea,
3    were you in other parts of the ship? Like
4    were you in, you know, a room or a -- where
5    you slept, in the mess hall where you ate,
6    and in other areas of the ship as well?
7        A.   Yes.
8        Q.   Would you say at one time or
9    another that you traveled, let's say for the
10   Independence, the entire ship?
11           DEFENSE COUNSEL: Objection to
12       form; leading.
13           MR. SMITH: Objection;
14       overbroad.
15   BY MR. PRESENT:
16       Q.   Go ahead. You can answer.
17       A.   The Lake Champlain and the
18   Independence or just the Independence?
19       Q.   Just the Independence for now.
20       A.   Pretty much, yes.
21       Q.   Okay. And would the same be true
22   on the Lake Champlain?
23       A.   Yes.
24           MR. SCHEETS: Same objection.

## Page 283

1            MS. McCORMACK: Objection to
2        form.
3            MR. SMITH: Objection; leading;
4        lacks foundation; calls for speculation;
5        overbroad as to time.
6            MR. PRESENT: Thank you.
7    BY MR. PRESENT:
8        Q.   Anyway, with respect to the --
9    your time in the radar room, you spoke with
10   Ms. McCormack about taking apart scopes and
11   seeing the name Raytheon. Do you recall that
12   testimony now? It was just recently.
13       A.   Yes.
14           MS. McCORMACK: Objection to
15       form.
16   BY MR. PRESENT:
17       Q.   Okay. With respect to the
18   Independence, can you give me some idea how
19   often you would be either working on a scope
20   or in the vicinity of someone else working on
21   a scope where you would see the name Raytheon
22   over the course of your time on the
23   Independence?
24           MS. McCORMACK: Objection;

1    leading; foundation; misstates prior
2    testimony.
3        MR. SMITH: Overbroad.
4    BY MR. PRESENT:
5      Q.  Go ahead. You can answer. Thank
6    you. Go ahead. You can answer.
7      A.  When -- after a scope was opened,
8    there were -- if you were the designated
9    petty officer or seaman that would assist,
10   scopes were opened I -- every 30 days, but
11   there were so many scopes, products that were
12   opened were opened possibly once every three
13   or four days, you know, with a malfunction or
14   something like that. But a total
15   dismemberment of -- dismantling of a -- of a
16   scope, we never totally dismantled it. We
17   took the front panels off, reworked it,
18   dusted it, and everything else. So probably,
19   of the 30-day scheduled maintenance that
20   it -- one scope was shut down, but there was
21   preliminary -- partial work done on scopes
22   almost every day that had to be cleaned or
23   whatever.
24      Q.  Okay. And --

1        MR. SMITH: Respectfully move
2    to strike nonresponsive portions and
3    portions lacking in foundation and based
4    on speculation.
5    BY MR. PRESENT:
6      Q.  Don't worry about that.
7      But leaving that aside, what
8    he said -- and he's probably going to object
9    to every question I ask, even though there's
10   only been, in the State of Pennsylvania,
11   believe it or not, five reversals on
12   evidentiary grounds since I've been a lawyer,
13   which has been, you know, at least ten years,
14   maybe longer.
15      Anyway, so what I want to know
16   at this juncture is, when you would open
17   these scopes where you saw the name Raytheon,
18   you talked about this process of dusting them
19   out, would -- would this happen each time one
20   of those scopes were opened up?
21        MS. McCORMACK: Objection.
22        MR. SMITH: Objection; vague
23    ambiguous; overbroad.
24   BY MR. PRESENT:

1      Q.  Go ahead. You can answer.
2      A.  Yes.
3      Q.  Okay. And when this dust was
4    there, did it come out of the same vicinity
5    where you saw that name?
6        MR. SMITH: Same objection.
7        MS. McCORMACK: Objection.
8        THE WITNESS: Yes.
9    BY MR. PRESENT:
10     Q.  Okay. And when the dust was --
11   was -- when the dust came out of that area,
12   where would it go?
13        MR. SMITH: Objection; lacks
14    foundation; calls for speculation, expert
15    opinion.
16        MS. McCORMACK: Objection.
17        THE WITNESS: It -- it would --
18   when you opened up the scope, if you shut
19   the fans off prior to opening, which was
20   part of what you had to do, the -- when
21   you opened it, the -- the air that was
22   coming in, because they were primarily
23   sealed units, fairly tight, they had
24   gaskets on, everything would just come

1    out of it. And it would go to where --
2    you know, in our faces, up in the air.
3    If we didn't have a vacuum cleaner to --
4    you know, that's one of the other things
5    we did was vacuum it down.
6        MR. PRESENT: Okay.
7        THE WITNESS: Initially, when
8    you opened it, everything came out.
9    BY MR. PRESENT:
10     Q.  When the dust went into the air
11   and in your face, would that have any effect
12   on your respiratory system or your
13   breathing --
14        MS. McCORMACK: Objection.
15        MR. SMITH: Objection.
16        MR. PRESENT: -- at all?
17        MR. SMITH: Vague; ambiguous;
18    overbroad.
19    BY MR. PRESENT:
20     Q.  Go ahead. You can answer.
21     A.  When any dust or debris comes
22   into your nose or mouth, you do breathe --
23   gag, cough so...
24        MR. SMITH: Leading objection;

1    lacks foundation; calls for speculation;
2    move to strike as nonresponsive.
3    BY MR. PRESENT:
4    Q.    And regardless of whether you
5    were on -- regardless of whether you were on
6    the --
7            (Whereupon, there was a brief
8        interruption.)
9            (Whereupon, there was a
10       discussion held off the record.)
11   BY MR. PRESENT:
12   Q.    Anyway, when you would -- when
13   you would, you know, do this, you know,
14   take-apart thing with a scope and saw the
15   name Raytheon, would this dust that you've
16   been speaking of, would that be in the air
17   and in your face each time that you would
18   either -- when you would -- each time that
19   you would work on that area?
20           MS. McCORMACK:  Objection;
21       leading; lack of foundation.
22           MR. SMITH:  Objection.
23   BY MR. PRESENT:
24   Q.    Would that happen each time?

1    A.    Yes.
2    Q.    And how about if you weren't
3    working on it but one of your colleagues,
4    another E-4 or whatever would be working on
5    it, would you also have -- would the dust
6    also have an affect on you when you were in
7    the vicinity of someone else doing that job?
8            MS. McCORMACK:  Same
9        objections.
10           MR. SMITH:  Objection; vague;
11       ambiguous; overbroad; lack of foundation;
12       calls for speculation, expert opinion.
13           THE WITNESS:  I have to clarify
14       what I'm saying.  You're in an area
15       that's no bigger than this room.
16           MR. PRESENT:  Okay.
17           THE WITNESS:  When anything
18       happened, there was no windows.  Now,
19       we're in the midship.  There's no
20       ventilation other than what's in there
21       and it's recycled air.  So if you open
22       something back by that window, which was
23       20 or 30 feet, it was contained in the
24       same area that you were working.

1            MR. PRESENT:  I get it.
2            THE WITNESS:  So yes, every
3        time something was opened, myself or
4        anyone that was on duty at that point in
5        time inhaled the dust.
6    BY MR. PRESENT:
7    Q.    Okay.  And if we were to -- if I
8    were to ask you the same questions about
9    Raytheon and this various activity of taking
10   apart scopes in terms of its frequency and
11   its effect on the air, would your answers be
12   the same for the Champlain that they are for
13   the Independence?
14           MS. McCORMACK:  Objection.
15           MR. SMITH:  Same objections.
16   BY MR. PRESENT:
17   Q.    Go ahead.  You can answer.
18   A.    Yes.
19   Q.    At any time when you would look
20   at any of the Raytheon name on -- on this
21   equipment, when the scopes were being taken
22   apart, and dust and such, did you ever see
23   any kind of, you know, big bold warning or
24   skull and cross bones that said, be careful,

1    dust from this item or from this area could
2    potentially cause cancer and is hazardous to
3    your health?  Did you ever see anything like
4    that on there?
5    A.    No.
6            MS. McCORMACK:  Objection to
7        form.
8            MR. SMITH:  Vague and
9        ambiguous; overbroad.
10           THE WITNESS:  The only warnings
11       that were on --
12           MR. PRESENT:  I --
13           THE WITNESS:  Okay.
14   BY MR. PRESENT:
15   Q.    In any event, did you see any
16   warnings telling you that you could get lung
17   cancer from that dust?  That's what I want to
18   know.
19   A.    No.
20   Q.    Okay.
21           MS. McCORMACK:  Objection to
22       form.
23           MR. SMITH:  Same objections,
24       plus leading.

BY MR. PRESENT:

Q. Just give me a moment, Mr. Damon.

You -- when you talked about opening up these scopes and seeing the -- or recalling seeing the name Raytheon, earlier you had mentioned, when you were discussing this either with Ms. McCormack or myself, that you -- when you would open that up, you would see materials such as gaskets and thus and such. Do you remember that?

MR. SMITH: Assumes facts not in evidence; misstates testimony.

THE WITNESS: Yes.

BY MR. PRESENT:

Q. Okay. Was it ever your job or anyone else's job that was with you to either alter or replace those gaskets that you saw when you opened up that equipment?

MS. McCORMACK: Objection.

THE WITNESS: Yes.

MR. SMITH: Leading.

BY MR. PRESENT:

Q. And was that all part of this same area where you saw the name Raytheon?

MR. SMITH: Leading.

THE WITNESS: Yes.

BY MR. PRESENT:

Q. Okay. Can I just ask you one question, and you may or may not be able to do this. But I want to take you back in time to where you're at -- you know, in the radar room, pulling apart for maintenance or repair one of these scopes, seeing the name Raytheon, seeing the gaskets, seeing the dust that you've described. Are you able to tell us as a group what else you remember seeing in that area? Is there anything else that you can describe for me?

MR. SMITH: Objection.

MS. McCORMACK: Objection.

MR. SMITH: Leading; vague; ambiguous; overbroad; asked and answered.

MR. PRESENT: Go ahead. It's a perfect question, so he can answer it.

MR. SMITH: Calls for speculation.

THE WITNESS: When you opened a scope or any electrical equipment, when

you remove it, you -- as a 17, 18, 19 year old person, there's all the wire and the tubes and the gaskets and -- and there was some air filters on it. There was fans. So when you opened it, you saw everything that was there.

MR. PRESENT: Okay.

THE WITNESS: You know, you were looking at a -- the top of it looked like a TV tube. And then it came down and there was your tubes and your wires and your gaskets. And -- and you sealed -- if you had a leak, you could -- the ground dust would create contamination in the unit, so you had to repair it. Anything that was wrong when you serviced, you checked everything.

MR. PRESENT: Okay.

MR. SMITH: Objection; move to strike the portions -- nonresponsive portions.

MR. PRESENT: All right. And I appreciate your taking the time to answer my questions as well. I may have some

others at some point in the future. Ms. McCormack may have a few more, based on my questions. But I appreciate your cooperation and your time.

THE WITNESS: Can I take five?

MS. McCORMACK: That was going to be my first question, did you need a break. Absolutely.

(Whereupon, a brief recess was taken.)

- - -

EXAMINATION

- - -

BY MS. McCORMACK:

Q. Mr. Damon, I just have a few follow-ups on Mr. Present's questions.

Am I correct that you told me before you only recall the Raytheon name in connection with the Lake Champlain?

A. The most --

Q. Or are you not sure what ship?

A. I -- I am -- I am sure it was on the Lake Champlain. I can't say I remember it as distinctly on the Independence.



1 It's -- it -- it was -- the scopes were the
2 same. They were updated a little bit more.
3 But none of the components have changed from
4 one -- the Lake Champlain or the
5 Independence. But you're more -- as you work
6 on these things, you're more used to the
7 components. So you don't look at the
8 components as startling as they were when --
9 the first time I opened these things and was
10 dazed by the complexity of one of these
11 things at 17, 18 years old. Then it just
12 became second nature, you did this, you did
13 that so...
14    Q. Okay. So it's fair to say you
15 recall the name Raytheon on the Lake
16 Champlain?
17    A. Yes.
18    Q. And on the Independence you're
19 not sure?
20    A. I -- I'm -- yeah, I -- I have to
21 say yes, because they were -- you know, it
22 was -- did it stick out -- like I said
23 briefly, did it stick out? No. But it was
24 there. It was the same components. So I --

1 I'm saying yes, that it was on both ships.
2    Q. Okay. And you don't recall which
3 component it was on either ship, correct?
4       (Whereupon, there was a brief
5    interruption.)
6       THE WITNESS: I'm sorry.
7       MS. McCORMACK: Do you want me
8 to ask the question again?
9       THE WITNESS: Yes, please.
10 BY MS. McCORMACK:
11    Q. You do not recall the component
12 part for -- that you associate with Raytheon
13 on either ship, correct?
14    A. The exact component, I would --
15 I'm trying --
16       DEFENSE COUNSEL: Can we
17 interrupt you. We have been missing the
18 last two minutes of testimony.
19       Can you hear me?
20       MS. McCORMACK: We can hear
21 you.
22       DEFENSE COUNSEL: Can the
23 reporter just read back since the break?
24       MS. McCORMACK: Since the break

1 he recalls the Raytheon name on the
2 Champlain and the Independence, but not
3 as strongly on the Independence as the
4 Lake Champlain. That's as far as we got.
5       DEFENSE COUNSEL: Okay, great.
6 Thanks. Appreciate it.
7 BY MS. McCORMACK:
8    Q. You don't know what the component
9 part is that you associate with Raytheon,
10 correct?
11    A. It was on the -- as I'm thinking,
12 as you ask me to recall, I -- to the best of
13 my recollection, it was on the plate of
14 the -- removal plate. So it was
15 somewhere on the plate itself, the -- the
16 front, the side, the back. It was on a
17 plate.
18    Q. And when you say the plate, what
19 are you referring to?
20    A. It's the cover.
21    Q. Just the cover?
22    A. It's the front, it's the back,
23 it's the side, the plates.
24    Q. Okay. And you don't recall which

1 plate it was?
2    A. No.
3    Q. Okay. And you only removed and
4 replaced the component parts, correct? You
5 did not open and repair any of the internal
6 parts in a component part, correct?
7    A. No. If I'm -- understood your
8 question correctly, when you take apart the
9 scope, you -- if you -- if you're working on
10 the front part, you're taking off the front.
11 When you're working on the rear part, you
12 take off the rear. And you're working on
13 everything inside the scope itself.
14    Q. Okay. And I -- you told us the
15 other day you did not have any training in
16 repairing or replacing the internal --
17    A. As an E --
18    Q. -- internals of the component
19 parts?
20    A. I was on-the-job training as an
21 E-3, working alongside an E-4 and E-5. I
22 didn't go to a A school, a radar A school.
23    Q. And Mr. Present talked to you a
24 bunch about some dust that you associated

1  with the inside of these component parts. Do
2  you know the composition of any of that dust?
3      MR. SMITH: Asked and answered.
4      THE WITNESS: Dust.
5  BY MS. McCORMACK:
6      Q.   Okay. But you don't know what
7  the dust was -- was made of, correct?
8      A.   It would be an assumption on my
9  part.
10      Q.   Okay. And you mentioned you saw
11  the name Raytheon on the -- one of the
12  plates. How big was the name?
13      A.   Approximately two inches.
14      Q.   Was it in block print? Was it in
15  cursive, capital letters, small letters?
16      A.   I was thinking of that when you
17  just said it, when the other attorney asked
18  me that last week with the -- with the
19  Philco, you know, was it block or was it
20  cursive. And it was just a fancy P. I would
21  have to say it was, you know, bold print
22  when -- to his question. I believe it was
23  just print. I don't believe it was script or
24  anything real fancy.

1      Q.   Do you associate any color with
2  it?
3      A.   Black.
4      Q.   Was there any other writing there
5  besides the word Raytheon?
6      A.   There was -- there was Raytheon;
7  then some numbers next to it. And then I
8  think it repeated itself.
9      Q.   Do you recall any of the numbers
10  that were next to Raytheon?
11      A.   Zero through nine.
12      MS. McCORMACK: I believe those
13  are all the questions I have at this
14  point. Thank you very much for your
15  time, Mr. Damon.
16      - - -
17      EXAMINATION
18      - - -
19  BY MR. PRESENT:
20      Q.   Mr. Damon, I'm just going to
21  focus for a minute in terms of my follow-up
22  questions to Ms. McCormack's questions on the
23  dust that you were talking about. She asked
24  you at -- and I'm just doing this to kind of

1  like focus on the point that -- at the
2  questioning where Ms. McCormack was asking
3  you about dust. But when she asked you about
4  the dust, she said to you, Mr. Damon, you
5  can't really tell me what the component parts
6  of the dust was. Do you remember her asking
7  you that?
8      A.   Yes.
9      Q.   Okay.
10      MS. McCORMACK: Objection to
11  form.
12  BY MR. PRESENT:
13      Q.   The dust that you saw, was that
14  dust only visible when the -- the area was
15  opened and the -- you know, the front was
16  taken off the -- the equipment in order to do
17  the maintenance or make the repairs? Is that
18  when the dust came out of there?
19      MS. McCORMACK: Objection;
20  misstates prior testimony; lack of
21  foundation.
22      THE WITNESS: Yes.
23      MR. SMITH: Objection to form.
24  BY MR. PRESENT:

1      Q.   Okay. And just based on what you
2  saw, do you believe, from what you saw,
3  that -- or do you know from what you saw that
4  any of the dust that emanated from the area
5  where you saw the name Raytheon came from
6  whatever was part of that equipment?
7      MS. McCORMACK: Objection.
8      MR. SMITH: Objection; vague
9  and ambiguous.
10      THE WITNESS: Yes.
11      MR. PRESENT: All right.
12  That's the only question I have then.
13  Nothing else.
14      MS. McCORMACK: I do not have
15  any more questions. Thank you.
16      (Whereupon, there was a
17  discussion held off the record.)
18      (Whereupon, a lunch recess was
19  taken.)
20      - - -
21      EXAMINATION
22      - - -
23  BY MR. KATTNER:
24      Q.   Ready to resume, Mr. Damon?

EXHIBIT B

866.MAGNA21

Graphic Consulting
Trial Presentation

LEGAL SERVICES

Court Reporting
Subpoena Services
Document Management

www.MagnaLS.com

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

CALVIN DAMON and     :
ROSEANNE DAMON, h/w    :    ORIGINAL
                :
      vs.        :
                :
AIREON MANUFACTURING   :
CORP., et al.       :    NO. 14-cv-01954-ER

- - -

MONDAY, APRIL 28, 2014

- - -

Videotaped deposition of

CALVIN DAMON, was held at the Hotel Fauchere,

401 Broad Street, Milford, Pennsylvania,

commencing at 2:02 p.m., on the above date,

before Deborah A. Brazukas, a Registered

Professional Reporter, Certified Shorthand

Reporter of New Jersey, License No. XI 01938,

and Notary Public.

MAGNA LEGAL SERVICES
(866) 624-6221
www.MagnaLS.com



give me five minutes.

MR. PRESENT: No. You know what, Mr. Damon has not been feeling well. He's been coughing frequently. He's been here a long time today asking questions. He's expecting a grandchild today. I am not going to delay this any further. Okay. That is my position. And I'm not changing it.

MR. SMITH: Okay. Just for the record --

MR. PRESENT: Just so you understand.

MR. SMITH: Okay. Will you let me speak for once and stop --

MR. PRESENT: I have never stopped you from speaking.

MR. SMITH: Okay. Well, let's try it one more time. Just for the record, if plaintiff's counsel's offer was actually valid, I think he could spare a few minutes while I look into this. He's saying he can't. And that leads me to believe that he's just trying

to create a record that doesn't really rely on anything in fact.

MR. PRESENT: Well, I object to that accusation. If you don't -- if you're going to enter into this deposition, you should have knowledge of the law and what works and what doesn't work.

MR. SMITH: And I can't make speaking objections -- I can't make objections that -- what is -- show me the rule where I can't make objections, Eliot? Show me -- point to me a case, anything --

MR. PRESENT: You know what, I did not know you were not going to be familiar with the rules, and I didn't bring a rule book today.

MR. SMITH: I'm very familiar with the rules.

MR. PRESENT: I'm letting you know what my offer is. I'm not going to delay this any further. Make your objections as you see fit.

1 MR. SMITH: Okay.
2 MR. PRESENT: And it is a
3 legitimate offer. And I object to you
4 making that comment about me.
5 MR. SMITH: Well, then you
6 should give me two minutes.
7 MR. PRESENT: I'm not. It's
8 going to take you a lot longer than two
9 minutes, Mr. Smith. And I'm not delaying
10 this for you to do legal research.
11 MR. SMITH: It's not legal
12 research.
13 MR. PRESENT: Okay, fine.
14 Well, we're going to proceed.
15 Can you read me back the last
16 questions, please.
17 (Whereupon, the court reporter
18 read back the record as requested.)
19 THE VIDEOTAPE OPERATOR: The
20 time is 2:25 p.m. We are back on the
21 record.
22 BY MR. PRESENT:
23 Q. Mr. Damon, with respect to your
24 exposure in the radar room, do you happen to

1 remember any of the names of the equipment
2 that you encountered while you were in the
3 radar room?
4 MS. RIECHELSON: Objection;
5 form.
6 MS. McCORMACK: Objection;
7 form.
8 MR. SMITH: Objection;
9 foundation; calls for speculation.
10 THE WITNESS: The names that I
11 recalled was the Philco, the Bendix,
12 Westinghouse, and Raytheon.
13 BY MR. PRESENT:
14 Q. Okay. With respect to the
15 Raytheon equipment, did you work on Raytheon
16 equipment?
17 MS. McCORMACK: Objection;
18 form.
19 THE WITNESS: The equipment
20 was -- Raytheon, I -- I -- as I remember,
21 was a -- a coating, a gasket. It wasn't
22 an equipment. It was a protective-type
23 thing. That's all I remember.
24 MR. SMITH: Respectfully move



ke the nonresponsive portions.
PRESENT:
Okay. And in what part of the
m was this?
MR. SMITH: Objection;
road.
PRESENT:
The Raytheon material that you're
bout.
It was -- I believe it was in the
emselves.
Okay. And with respect to that
would you work on those scopes?
Yes.
How frequently during the two
the Champlain would you -- Lake
ain would you work on those scopes?
MS. McCORMACK: Objection to
; leading.
THE WITNESS: The -- the
tenance that was done on the
oment in the radar room, ECM room,
sey room, adjacent utility room, was a
duled per piece of equipment just

t every 30 days. But when you had
5 pieces of equipment, 30 pieces of
pment, there was basic maintenance
on one or more of the equipment on a
basis or every other day.
At sea, they were done less
uency -- less frequent than in port.
so that every day something was
g done somewhere in those three
ns.
MR. PRESENT: Okay.
MR. SMITH: Respectfully move
rike the nonresponsive portions.
THE WITNESS: I'm sorry.
. PRESENT:
That's all right.
With respect to the -- the
ient that you associate with the name
on, when you would work on that
ient, the work that you did on that
ient, did that affect the atmosphere in
y?
MS. McCORMACK: Objection;
n; leading.

1  MR. SMITH: Objection; lacks
2  foundation; calls for speculation --
3  THE WITNESS: Yes.
4  MR. SMITH: -- calls for expert
5  opinion.
6  THE WITNESS: Yes.
7  BY MR. PRESENT:
8  Q.  And in what way did it affect the
9  atmosphere?
10  MR. SMITH: Same objections.
11  THE WITNESS: Dust, dust and
12  dust.
13  BY MR. PRESENT:
14  Q.  Okay. And -- and where would
15  that dust come from?
16  MR. SMITH: Same objections.
17  THE WITNESS: Inside the
18  equipment as it was being opened or,
19  removed.
20  BY MR. PRESENT:
21  Q.  And when -- when that would
22  occur, would that have any effect on you?
23  MS. McCORMACK: Objection;
24  leading; foundation; calls for expert

1  testimony.
2  MR. SMITH: Same objections.
3  THE WITNESS: Yes. Inhaling
4  any dust or debris has an effect on you,
5  coughs. And you wave your hand to get it
6  away from you.
7  BY MR. PRESENT:
8  Q.  Okay. And with respect to that,
9  was that a situation that occurred each and
10  every time you worked on a piece of equipment
11  that you associated with the name Raytheon or
12  a product that you associated with the name
13  Raytheon?
14  MS. McCORMACK: Same
15  objections.
16  MR. SMITH: Same objections,
17  plus overbroad plus leading.
18  THE WITNESS: More times than
19  not if we had to work on a piece of
20  machinery the next day to change a part
21  that we didn't have, it wouldn't -- we
22  already cleaned a piece of machinery, the
23  very next day it wouldn't happen. If the
24  machinery sat for a week or two or three

W
O
R
D

I
N
D
E
X



weeks or four weeks, all the dust that
was in there came -- came out.
Y MR. PRESENT:

Q. With respect to this dust, do you
ve knowledge now about the dust that you
re exposed to in this activity was your
bestos -- was made of asbestos or --

A. Now I do.

MR. SMITH: Objection;
overbroad.

Y MR. PRESENT:

Q. And did you see any kind of
rning on any on the Raytheon equipment
ling you that -- that this dust could
er cause lung cancer or make you sick?

A. No. The only --

MS. McCORMACK: Objection;
leading.

MR. SMITH: Overbroad.

THE WITNESS: -- the only
warnings that were on any equipment were
shock warnings, electrical shock
warnings.

Y MR. PRESENT:

Q. Okay. With respect to this --
ese scopes that you associate with the name
aytheon, would you have encountered the same
ime and engaged in the same activity when
u were on the Independence as well?

MS. McCORMACK: Objection;
leading; lack of foundation.

MR. SMITH: Vague; ambiguous;
overbroad.

THE WITNESS: As -- as I stated
earlier, I don't know if it's part of
this, the Lake Champlain and the
Independence were two different styles of
aircraft carrier, but they were similar
carrier. The equipment on the Lake
Champlain was very similar, if not the
same on the lake -- on the Independence.
The Independence may -- had some newer
versions of -- of radarscopes and
equipment than on the Lake Champlain.
And when you're working on a piece of
machinery that you've seen, I'm -- I'm
saying every day for a couple years, when
you see that same or similar piece of

1  equipment on -- on something else, you
2  just work on it. You're not paying as
3  much attention on names or -- or, you
4  know, just, you know, the circuitry may
5  change a little bit and you -- but that's
6  what you're doing.
7          MR. SMITH: Respectfully move
8  to strike the nonresponsive portions.
9  BY MR. PRESENT:
10         Q. Okay. With respect to the work
11 that you associate with the name Raytheon,
12 were you in one of the three rooms that you
13 talked about, the radar room, the pomsey
14 room, the utility room, were you in those
15 rooms when other individuals worked on things
16 that you associated with the name Raytheon as
17 well?
18         MS. McCORMACK: Objection to
19 form.
20         MR. SMITH: Vague; ambiguous;
21 overbroad.
22         THE WITNESS: When we were at
23 sea, we were on port and starboard
24 shifts. And that meant four hours on and

1  four hours off. So at least 12 hours of
2  the day I was in one, if not all of these
3  rooms, including lookout stations through
4  my watches.
5  BY MR. PRESENT:
6          Q. Okay. And did -- with respect to
7  your time at sea, would you -- can you tell
8  us where the Lake Champlain went to during
9  your career on the ship?
10         A. We did a North Atlantic
11 anti-submarine warfare exercise. Then we
12 did -- went -- went to the Mediterranean, and
13 we also were on site for the recovery of
14 Gemini III and Gemini V.
15         Q. Okay. With respect to the -- the
16 Raytheon-associated product, did you
17 actually -- when you were not maintaining it,
18 did you actually use that equipment also
19 while you were on the ship?
20         MS. McCORMACK: Objection to
21 form; leading.
22         THE WITNESS: The --
23 BY MR. PRESENT:
24         Q. As a -- as a radar man?

MR. SMITH: Objection; vague; ambiguous.

THE WITNESS: As a radar man you were operating the equipment that contained the Raytheon, yes.

Y MR. PRESENT:

Q. All right. You also mentioned e name Westinghouse. Did you work on uipment that was labeled Westinghouse?

A. Yes.

Q. And with respect to your work on e Westinghouse equipment, can you explain hat kind of work you would do and how equently that would happen?

A. It was -- the equipment estinghouse was maintained similar to all e other equipment. We worked the same eaning schedule, the same repair schedule, e same down time on every piece of uipment that we worked with.

Q. Okay. And what -- can you scribe this Westinghouse equipment that you orked on, what -- where was it and what did look like?

MR. SMITH: Objection; compound.

THE WITNESS: I believe -- I believe it was the -- a component of the scopes.

Y MR. PRESENT:

Q. Okay. And where was it located?

A. On every scope.

Q. Okay. And how often would you be orking on Westinghouse equipment?

A. You're sitting in front of the copes during your 12-hour shifts, whichever cope, your -- whatever scope needed to be aintenanced was shut down and it was worked n. It was -- they -- you couldn't move hem. So you would shut down, and you would work on that scope, and the scope -- and I'm ust using a number. I'm not saying exactly this is the way it was, scope one, two, or three, they'd shut down scope one; you'd work on one. They'd energize scope two or three to -- that would take the place of the scope that was working on.

Q. Okay. And when you would work on

1 the equipment labeled Westinghouse, would you
2 have to take any of the equipment apart?
3     MR. SMITH: Objection; leading.
4     THE WITNESS: You're taking --
5 you're dissembling -- you're -- you're
6 taking apart the units to work on the
7 insides of them, yes.
8     MR. SMITH: Ambiguous.
9 BY MR. PRESENT:
10    Q. Okay. And when you would do
11 that, would that process on the Lake
12 Champlain affect the atmosphere in any way?
13    A. Yes.
14     MR. SMITH: Objection; vague;
15 ambiguous; overbroad; calls for expert
16 opinion; lack of foundation; speculation.
17 BY MR. PRESENT:
18    Q. And how would it affect the
19 atmosphere?
20     MR. SMITH: Same.
21     THE WITNESS: Dust, debris.
22 BY MR. PRESENT:
23    Q. And would that have any effect on
24 you?

1    A. Myself and anyone else that was
2 in the -- the immediate vicinity.
3     MR. SMITH: Same.
4 BY MR. PRESENT:
5    Q. What sort of effect would it have
6 on you?
7     MR. SMITH: Same.
8     THE WITNESS: You're working on
9 something, a puff of smoke comes out,
10 you're there, you're trying to wave it
11 around. You hold your breath and just
12 try to wave the debris or the dust away
13 from you.
14 BY MR. PRESENT:
15    Q. Okay. And did this happen every
16 time you worked on Westinghouse equipment?
17     MR. SMITH: Same; also
18 overbroad.
19     MR. KATTNER: Objection.
20     THE WITNESS: When you opened
21 the components up, yes. When you were
22 working on the face, no.
23 BY MR. PRESENT:
24    Q. Okay. And -- and how frequently

EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

IN RE: ASBESTOS PRODUCTS

LIABILITY LITIGATION (No. VI)

_____

CALVIN DAMON and ROSANNE DAMON, h/w,.

     Plaintiffs,

   Vs.

AIREON MANUFACTURING
CORP., et al.
          Defendants.
--------------------------------------

    Transcript of the continued videotape
deposition of CALVIN DAMON, called for Oral
Examination in the above-entitled action, said
deposition being taken by and before MICHAEL R.
MONAHAN, a Registered Professional Reporter and
Notary Public, held at the Best Western Inn at
Hunt's Landing, 120 Routes 6 & 209, Matamoras,
Pennsylvania, on November 18th, 2014, commencing at
10:30 in the morning.

MAGNA LEGAL SERVICES
Seven Penn Center
1635 Market Street
8th Floor
Philadelphia, PA 19103
(215) 207-9460

866.MAGNA21

Jury Research
Graphic Consulting
Trial Presentation

MAGNA
LEGAL SERVICES

Court Reporting
Subpoena Services
Document Management

ww.MagnaLS.com

COPY



1  A    The ECM room was off the radar room.
2  There was probably, it was all electronic equipment,
3  I'm going to say a bank of probably six.
4  Q    Was there any major difference between
5  the two ships?
6      MR. SMITH:  Objection, vague and --
7      MR. PAUL:  Excuse me, let me finish my
8  question.  I know you want to, I know that you
9  enjoy objecting, but you have to wait until I
10  ask the question first.
11      MR. SMITH:  I enjoy doing my job.  There
12  was a pause and I thought you were, so I
13  apologize.
14      MR. PAUL:  I'm so happy for you.
15  Q    Again my question was, was there any
16  difference, you talked about how many there were,
17  radar scopes, and my question was, was it the same
18  number of radar scopes on the two ships or was there
19  a difference in the number of radar scopes between
20  the two ships.
21      MR. SMITH:  Objection --
22  A    There was probably more on the
23  Independence because it was a larger ship and a
24  newer ship.
25  Q    If we said, you said let's see, eight,

1  if I counted right from what you said, about 16
2  radar scopes on the Lake Champlain.  How many were
3  there on the Independence?
4      MR. SMITH:  The same objection.
5      MS. BRIDDELL:  Speculation.
6  A    Probably a half a dozen more.
7  Q    You mentioned this palmsy, did the
8  palmsy brush, did it use the term P-O-M-S-E-E, does
9  that sound familiar, do you know what that word
10  means?
11      MR. SMITH  The same objection.
12  A    No.
13  Q    The dust that you described, did that
14  happen every time you removed a tube?
15      MR. SMITH:  Objection, vague, ambiguous,
16  misstates testimony.
17      MS. BRIDDELL:  Asked and answered.
18  A    Every time you opened the machine, yes.
19      MR. PAUL:  Okay.
20      THE VIDEOGRAPHER:  The time is now 2:02
21  P.M.  We're off the record.
22      (A brief recess was taken.)
23      THE VIDEOGRAPHER:  Time is now 2:10 p.m.
24  We're on the record.
25  BY MR. PAUL:

1  Q    I have one more question about tubes and
2  radar scopes, which it occurs to me we didn't ask.
3  How many tubes are there in each radar scope?
4      MR. SMITH:  Objection, vague and
5  ambiguous, or do they vary?  Leading.
6  A    I would say there's, between junction
7  boxes which are a form of circuitry, probably
8  around, probably about 15 different tubes and other
9  junction boxes.
10  Q    In each one?
11  A    Yes.
12  Q    Does it make a difference, are there a
13  different number of tubes in each radar scope,
14  whether it was the Lake Champlain or the
15  Independence?
16      MR. SMITH:  Objection, leading.
17  A    There aren't, there is not.  There are
18  different scopes but there are not different tubes.
19      MR. PAUL:  I want to move on to some other
20  areas that I want to talk about.  Within the
21  last couple of weeks I provided to defense
22  counsel certain documents which I want to go
23  over.  I'm going to mark them as 1,
24  Plaintiff's 1.  I'm going to identify each
25  page however for the record, which should be

1  relatively clear and then I'll give it to the
2  court reporter at the end.
3  The first --
4      MS. REICHELSON:  I just want to place an
5  objection on the record, to the extent that
6  any questions are beyond the scope of the
7  testimony today.
8      MR. SMITH:  I join.
9      MS. REICHELSON:  I move to strike any
10  testimony that arises out of these questions.
11      MR. SMITH:  Join.
12  Q    Sir, earlier in this deposition you
13  testified that I had given you some documents to
14  look at?
15  A    Yes.
16  Q    Last night.  Are these those documents?
17  A    Without looking at every one, I would
18  say yes.
19      MR. SMITH:  Objection, leading, and I
20  believe it also misstates testimony to the
21  extent that plaintiff has, Mr. Damon at his
22  last deposition I believe said they he looked
23  at records before his first deposition without
24  Mr. Present --
25      MR. PAUL:  That's right.

1    MR. SMITH: I didn't know that was you.
2    MR. PAUL: I'm not Mr. Present.
3    MR. SMITH: Yes, that's right.
4    MR. PAUL: These are the documents that he
5    looked at last night.
6    MR. SMITH: Last night.
7    MR. PAUL: That's right, that's what we're
8    talking about.
9    MR. SMITH: Okay.
10   MR. PAUL: I'm not going over anything
11   that we went over the last time.
12   BY MR. PAUL:
13   Q   The first document is called Instruction
14   Book for Radar Set AN/SPN-12(XN-1) from the Raytheon
15   Manufacturing Company. And I will represent,
16   although it's clear from the documents, that these
17   are from the National Archives.
18   You talked about Raytheon in the last
19   deposition, as I recall?
20   A   Yes.
21   Q   When you looked through these documents
22   was there anything, and I'll stick to the first,
23   that particular one first. Was there anything about
24   this document, that is, the one for the AN/SPN-12
25   that looked familiar to you, sir?

1    MS. McCORMACK: Objection to the form.
2    MR. SMITH: Objection, leading.
3    A   I'm looking through it, and again I'm a
4    visual individual and I saw a piece of equipment
5    that looked familiar.
6    Q   And that's the document that's marked
7    Section 3, Paragraph 4, Confidential Navships
8    91778(A). What is this piece of equipment, sir?
9    A   I can read what it says, it says it's a
10   gyro compass. It's part of the IFF equipment or the
11   ECM equipment.
12   Q   Did you personally work on this
13   particular equipment?
14   MS. McCORMACK: Objection, asked and
15   answered.
16   MR. SMITH: Leading.
17   A   It may not be this exact piece of
18   equipment, but something very similar to this.
19   Q   Tell us about the piece of equipment
20   that you worked on, is it something that you told us
21   about before or is this a different piece of
22   equipment?
23   A   This is one of the pieces of equipment
24   that would be in the ECM room.
25   Q   Is this the kind of, just so that we're

1    clear, you talked about ECM equipment the last time.
2    Is this the kind of thing you were talking about or
3    is it a different piece of equipment?
4    MR. SMITH: Objection, leading.
5    A   That's part of the bank of equipment
6    that I mentioned.
7    Q   Did you ever have to open this
8    particular piece of equipment up?
9    MR. SMITH: Objection, it lacks
10   foundation, it calls for speculation, assumes
11   facts not in evidence.
12   MS. McCORMACK: Objection.
13   MR. SMITH: How can it lack foundation if
14   he personally did something, counsel?
15   MR. SMITH: He doesn't even know if he
16   worked on this piece of equipment.
17   MS. McCORMACK: Objection.
18   MR. PAUL: I just want to make sure I
19   understand the nature of your objection. Go
20   ahead.
21   A   Basically every piece of equipment in
22   the ECM room, and basically every piece of equipment
23   in the CIC, forward CON, the CON, at one point in my
24   naval career I worked on just about every piece of
25   equipment there.

1    MR. SMITH: Objection, move to strike
2    portions lacking foundation, based on
3    speculation and non-responsive.
4    MR. PAUL: Let's agree that you have that
5    objection to every question, so you don't have
6    to keep saying it each time.
7    MR. SMITH: I'm not sure that there's that
8    basis in law for that.
9    MR. PAUL: Alright.
10   Q   What did you do with the piece of
11   equipment -- did you know whether it was Raytheon
12   that you worked on specifically, because you
13   mentioned Raytheon before. Did you work on a
14   Raytheon piece of equipment that looks like what's
15   pictured in Radar Set AN/SPN-12?
16   A   Yes.
17   MS. McCORMACK: Objection.
18   MR. SMITH: Assumes facts not in evidence.
19   Q   Tell us what you did with that piece of
20   equipment?
21   (Discussion off the record)
22   Q   Do you understand the question?
23   A   Yes, I do.
24   Q   Okay.
25   A   I worked on, I'm saying 99 percent

MAGNA
LEGAL SERVICES

Q. Okay.

A. Sometimes if you didn't have an assistant, you know, there wasn't -- it was just you and an E-5, the machine broke down, you had to open it up and take it apart.

Q. Understood.

Could you provide your best estimate of what percentage of time as an E-4 you would have done, quote, unquote, E-3 duties, such as dusting and all those duties that you talked about earlier today as an E-3, working with the radar?

A. (No response.)

MR. PRESENT: Do you understand the question, Mr. Damon?

THE WITNESS: I'm trying to -- to understand and define your -- your question to me.

BY MR. SMITH:

Q. Let me restate it. I'm just trying to figure out what percentage of time when you were an E-4 you were -- spent actually -- and this is with respect to work on radar equipment.

A. Right.

Q. I'm trying to figure out what percentage of your time you would have been actually repairing equipment versus doing cleanup of the work?

A. Every time you repaired the equipment, the equipment had to be cleaned to -- to properly work on it. Sometimes there was somebody there to help, and other times there wasn't. I'd have to say 50/50, if that's a good answer for you.

Q. If that's your best estimate, that's a good answer.

A. I -- I would have to say it -- probably -- it's not 50/50. I don't know how to answer the question --

Q. Well --

A. -- exactly the way you're asking it.

Q. Okay. Let me ask --

A. And I don't mean to be rude, okay.

MR. PRESENT: Please don't interrupt him. Please don't interrupt

1  him.
2        THE WITNESS: If, when I open
3  the machine -- and we were around the
4  machines every four; four hours on, four
5  hours off. If something was leftover
6  from the shift before, you had to take it
7  over. When you're out at sea for 30 and
8  45 days at a time, you're constantly in
9  front of these machines. You are
10  opening. You're trying to get them to
11  breathe. You're trying to work on the
12  down machine. When the down machine is
13  off, you -- you go in another room and
14  shut down all the power.
15        But you're not always a grunt.
16  You know, just because you have a rank
17  doesn't mean -- in my case, it didn't
18  mean that I was going to let somebody
19  else do all the dirty work. I had to
20  pitch in. So I -- I am not that type of
21  person. That's the reason I would have
22  never made a good officer.
23        But I was -- I'd have to say
24  80 percent of the time I was involved in

1  all parts of it. More often, I would
2  say, when I was an E-3, I was doing more
3  of the dirty work on a consistent basis.
4  But as -- when I became an E-4, I was
5  still doing all the work beside my guys.
6  So I wasn't -- I was -- didn't designate
7  the same crap jobs that somebody gave to
8  me.
9        I'd have to say 80 percent, if
10  you're looking for a number, of the time
11  I was involved with the machinery,
12  opening it and closing it; actually
13  vacuuming it, if there was a vacuum
14  there or a brush there that somebody
15  didn't get, I would have to do it.
16  You're working on stuff that gets dusty
17  real quick.
18        MR. SMITH: Sure.
19        THE WITNESS: And you have to
20  keep it clean.
21        MR. SMITH: Okay. And just --
22  I have to make statements for the record.
23  Respectfully move to strike
24  non-responsive portions and portions

1  because there's probably one piece of machinery that
2  I didn't work on that wasn't in my bailiwick of what
3  I did. I've taken apart every one of these things.
4      MR. SMITH: The same objection.
5      Q    What happened when you took apart the
6  piece that looked like this piece?
7      A    You try to remove the front cover first,
8  and then, some of the stuff was on a rack so some of
9  the stuff had handles you pull out, some you didn't.
10 They were on the end because you could work on them.
11 When you're taking apart the equipment it was
12 de-energized, that was the best time to take it
13 apart and you would, do you want me to show you?
14     MR. SMITH: The same motion.
15     Q    Yes, go ahead.
16     A    We had different vent areas that were
17 for aeration coming through. The back of the area
18 and the side of the area where the heavily, where
19 mostly dust would accumulate because it didn't have
20 the proper flow, you would take it apart, you would
21 try to undo the front screen and then that would
22 expose certain elements. Some of the units you
23 would be able to pull out the instruments from once
24 you've removed the cover. Some you had to take off
25 the sides, some you had to take off the backs. I

1  don't know if I answered the question, but that's
2  how you did it.
3      MR. SMITH: Move to strike on the same
4  grounds.
5      Q    When you talk about elements, would you
6  explain to the jury what that means, what you mean
7  by an element?
8      MR. SMITH: Leading.
9      A    Element, you had different tubes, you
10 had different wires, you had different coils that
11 connected your wiring. The term element was
12 different parts of the machinery, that's how I'm
13 using the word element.
14     Q    Can you describe the product, what was
15 inside this product that looked like this Raytheon
16 piece of equipment?
17     MR. SMITH: Objection, vague and ambiguous
18 and broad.
19     MS. McCORMACK: Objection.
20     Q    Go ahead.
21     A    You had --
22     MR. SMITH: Leading.
23     A    -- gauges that indicated polarity,
24 direction. You had gauges which indicated voltage.
25 You had, there was your different gain switches that

1  would intensify or brighten or raise the meter up
2  based on what's happening in the air.
3      Q    This document references cables. Do you
4  know what that is, what the cable is?
5      MR. SMITH: Objection, vague, ambiguous.
6  Leading, over broad.
7      A    Cables?
8      Q    Cables, yes.
9      A    Your items were powered and one would
10 attach to the other and transfer information.
11     Q    What was the condition of this piece of
12 equipment when you opened it up?
13     MR. SMITH: Leading, vague and ambiguous.
14     MS. McCORMACK: Objection.
15     A    The condition? They were there 10, 15
16 years before I got there, so some of them were
17 chipped, some of them were repainted. Some were,
18 when I opened up a piece of equipment, I wasn't
19 looking at the age of the equipment, I was looking
20 in and I would pull out a schematic and see what
21 needed to be replaced and tried to find it and trace
22 it.
23     MR. SMITH: Objection, move to strike
24 non-responsive portions.
25     Q    What was the condition when this radar

1  set was opened up?
2      A    The condition --
3      MR. SMITH: The same objections.
4      A    The condition? Whenever you opened
5  these things up, the condition was poor because you
6  wouldn't have had to open them up if they weren't,
7  if they were prior services. When you open these
8  things up, they were running 24/7 until the
9  maintenance and they ran every minute of every day
10 so they heat up and dust, that's the maintenance on
11 it. So they're dusty, dirty, sometimes they smelled
12 of burning stuff when you opened them.
13     MR. SMITH: Move to strike unresponsive
14 portions.
15     Q    Was it your job to clean this box out?
16     MR. SMITH: Objection, leading, over
17 broad.
18     A    When you opened the unit you had to
19 clean the unit, you had to dust the unit, you had to
20 vacate any other debris that was in the area that
21 you were working so that the dust would not conduct
22 a different flow of the units.
23     MR. SMITH: Move to strike on the same
24 grounds.
25     Q    There are parts that are mentioned in

1  this document called terminal boards. That's a
2  terminal board?
3      MR. SMITH: Leading.
4      A   A terminal board is where you have a
5  plate where your condenser is, your relays are, and
6  a terminal board, we mentioned a mother board
7  before, your terminal board was contact to where
8  your base of your tubes were.
9      Q   Do you know what the composition of the
10 board was?
11     MR. SMITH: Calls for speculation, lacks
12 foundation.
13     MS. McCORMACK: Objection.
14     A   'No, I don't.
15     Q   Do you know what a toggle switch is?
16     A   Yes.
17     MR. SMITH: Leading.
18     Q   What's a toggle switch?
19     A   Toggle switches were all used on a lot
20 of the, they were used on all the machinery, on all
21 the scopes and all the different varieties of ECM
22 equipment. They were turning the unit on, turning
23 it off. Basically that's what they did.
24     Q   There's a reference in this document to
25 what's known as retainer packing and sealing

1  unit, they were not tight compacted, they were
2  puffy.
3      Q   There's a reference to something called
4  an oil seal. Do you know what that is?
5      MR. SMITH: The same objection.
6      A   That might have been on one of the
7  scopes, I'm not sure.
8      Q   It's identified, again it's still the
9  same product, it's identified as "weather seal in
10 the reflector bracket adapter." Do you know what
11 those terms mean?
12     MR. SMITH: The same objection.
13     MS. McCORMACK: Objection.
14     A   I know what they mean but I can't place
15 them on the machinery.
16     Q   The next one is an Instruction Book for
17 Radar Set AN/SPN-8(XN-1) from the Bendix Radio
18 Company.
19     MS. REICHELSON: Note my objection.
20     Q   Take a look at this again. Having
21 looked at this, is there anything in this document
22 that looks familiar to you?
23     MR. SMITH: Leading.
24     A   Just some of the terminologies and names
25 of stuff that I haven't looked at in 50 years.

1  packing. Do you know what those things are?
2      MR. SMITH: Objection, vague and ambiguous
3  over broad, leading.
4      Q   Do you know what those are?
5      A   I know what the word packing is, yes.
6      Q   Tell us what packing is?
7      A   When you're puting a switch in --
8      MR. SMITH: Objection.
9      A   -- there is an element that has to
10 protect your contacts and that's what we had.
11     Q   Do you recall ever handling this packing
12 when you opened up this particular piece of
13 equipment that we're talking about.
14     MR. SMITH: Objection, leading, vague,
15 misleading.
16     MS. McCORMACK: Objection.
17     A   You could not help touching it because
18 you were removing the switches and replacing the
19 switches.
20     Q   What was the condition of the packing
21 when you opened up the equipment, do you recall?
22     MR. SMITH: The same objection.
23     MS. McCORMACK: Objection.
24     A   Depending on the last time it was
25 serviced, they were frayed more from the heat of the

1      MS. REICHELSON: Move to strike.
2      Q   Which of those look familiar to you?
3  Let me ask you that.
4      MR. SMITH: Leading.
5      A   Without my reading glasses on, I
6  remember reading it last night. Some of the
7  terminology about the switches and how to operate
8  them, that's basically it.
9      Q   You had mentioned, you talked about
10 Bendix at the last deposition, do you recall that?
11     A   Yes.
12     Q   Is this the Bendix product, if you
13 recall, or is it a different Bendix product.
14     MS. REICHELSON: Objection, asked and
15 answered, lack of foundation, and beyond the
16 scope again.
17     MR. SMITH: Leading.
18     MS. McCORMACK: Objection.
19     A   I don't know exactly.
20     Q   What Bendix product were you talking
21 about the last time?
22     MS. REICHELSON: Asked and answered over
23 and over again.
24     MR. SMITH: Leading.
25     Q   You can answer.

EXHIBIT D

Reproduced from the Unclassified / Declassified Holdings of the National Archives

NAVSHIPS 91778(A)

CONFIDENTIAL
SECURITY INFORMATION
*(Non-Registered)*

INSTRUCTION BOOK

*for*

# RADAR SET
# AN/SPN-12(XN-1)



RAYTHEON MANUFACTURING COMPANY
WALTHAM, MASSACHUSETTS

BUREAU OF SHIPS     DEPARTMENT OF THE NAVY

*Contract: NObsr-57066*     *Approved by BuShips: 16 October 1952*

DECLASSIFIED
Authority NND974382

Reproduced from the Unclassified / Declassified Holdings of the National Archives

# TABLE OF CONTENTS

## SECTION 1—GENERAL DESCRIPTION

| Paragraph | Page |
|---|---|
| 1. Purpose | 1-1 |
|    *a.* Instruction Book | 1-1 |
|    *b.* Equipment | 1-1 |
| 2. Basic Principles of Operation | 1-1 |
|    *a.* General | 1-1 |
|    *b.* Relative Air Speed | 1-1 |
|    *c.* True Air Speed | 1-1 |
| 3. Description and Function of Units | 1-1 |
|    *a.* General | 1-1 |
|    *b.* Receiver-Transmitter, Radar RT-249 (XN-1)/SPN-12 | 1-1 |
|    *c.* Power Supply PP-753 (XN-1)/SPN-12 | 1-3 |
|    *d.* Computer, Navigational CP-110(XN-1)/SPN-12 | 1-3 |
|    *e.* Cabinet CY-1103 (XN-1)/SPN-12 | 1-5 |
|    *f.* Remote True Air Speed Indicators | 1-5 |
|    *g.* Gyro Compass Synchro Amplifier Mark 3 Mod. 1 | 1-5 |
| 4. Location of Components | 1-5 |

## SECTION 2—THEORY OF OPERATION

| Paragraph | Page |
|---|---|
| 1. General | 2-1 |
| 2. Basic Principles of CW Radar | 2-1 |
|    *a.* Introduction | 2-1 |
|    *b.* Doppler Effect | 2-1 |
| 3. System Function | 2-2 |
| 4. Power Supply PP-753(XN-1)/SPN-12 | 2-4 |
|    *a.* General | 2-4 |
|    *b.* Magnetron Filament Supply | 2-4 |
|    *c.* High Voltage Power Supply | 2-4 |
|    *d.* Magnetron Current Regulator | 2-5 |
| 5. Receiver-Transmitter, Radar RT-249 (XN-1)/SPN-12 | 2-7 |
|    *a.* General | 2-7 |
|    *b.* Magnetron Filament Filter | 2-7 |
|    *c.* Magnetron | 2-7 |
|    *d.* RF System | 2-7 |
|    *e.* Crystal Detector | 2-10 |
|    *f.* Video Amplifier | 2-10 |
| 6. Computer, Navigational CP-110(XN-1)/SPN-12 | 2-13 |
|    *a.* General | 2-13 |
|    *b.* Filter Selector Network | 2-13 |
|    *c.* Limiter Circuit | 2-14 |
|    *d.* Servo System | 2-15 |
|      (1) Counter Circuit | 2-15 |
|      (2) Balanced Modulator | 2-15 |

| Paragraph | Page |
|---|---|
|      (3) Servo Amplifier | 2-16 |
|      (4) Follow-up Potentiometer | 2-17 |
|    *e.* Synchro System | 2-17 |
|      (1) General | 2-17 |
|      (2) Relative Speed | 2-18 |
|      (3) Wind Velocity Synchro System | 2-18 |
|      (4) 5DG Synchro | 2-18 |
|      (5) Gyro Compass Synchro Amplifier Mark 3 Mod. 1 | 2-18 |
|      (6) True Air Speed Indicators | 2-18 |
|      (7) Graphic Presentation of Computer Data | 2-18 |
|        (*a*) General | 2-18 |
|        (*b*) Recorder System | 2-18 |
|    *f.* Good-Bad Circuit | 2-19 |
|      (1) General | 2-19 |
|      (2) Circuit Details | 2-20 |
|    *g.* Audio Circuit | 2-21 |
|      (1) General | 2-21 |
|      (2) Circuit Details | 2-21 |
|    *h.* Tracking Control Circuit | 2-21 |
|      (1) General | 2-21 |
|      (2) Remote Operation | 2-21 |
|      (3) Local Operation | 2-22 |
|    *i.* Low Voltage Power Supply | 2-22 |
|    *j.* Primary Power Distribution | 2-22 |
|    *k.* Test Equipment | 2-24 |
|      (1) General | 2-24 |
|      (2) Frequency Standard | 2-24 |
|      (3) Frequency Multiplier | 2-24 |
|      (4) Pocketscope | 2-25 |
|      (5) AC Vacuum Tube Voltmeter | 2-25 |

## SECTION 3—INSTALLATION

| | Page |
|---|---|
| 1. Unpacking Instructions | 3-1 |
| 2. Preliminary Inspection | 3-1 |
| 3. Installation | 3-1 |
|    *a.* Installation Requirements | 3-1 |
|      (1) Location of Units | 3-1 |
|      (2) Precautions | 3-1 |
|      (3) Receiver-Transmitter, Radar RT-249(XN-1)/SPN-12 | 3-3 |
|        (*a*) Mounting | 3-3 |
|        (*b*) Location | 3-3 |
|        (*c*) Clearance | 3-3 |
|        (*d*) Cabling | 3-3 |
|      (4) Computer, Navigational CP-110(XN-1)/SPN-12 | 3-3 |
|        (*a*) General | 3-3 |
|        (*b*) Mounting | 3-3 |

DECLASSIFIED
Authority NND974382

Reproduced from the Unclassified / Declassified Holdings of the National Archives

# TABLE OF CONTENTS—Continued

*Paragraph*    Page

(c) Location .............................. 3-3
(d) Clearance ............................ 3-3
(e) Cabling .............................. 3-3
(f) Positioning .......................... 3-3
(g) Bonding ............................. 3-3
(h) Suggested Arrangement ...... 3-3
(5) Power Supply
PP-753(XN-1)/SPN-12 .......... 3-3
(6) Cabinet CY-1103(XN-1)/SPN-12   3-3
(7) Speed Indicators
ID-323(XN-1)/SPN-12 and
ID-324(XN-1)/SPN-12 .......... 3-9
(a) General ............................. 3-9
(b) Mounting ......................... 3-9
1. Indicator, Speed
ID-323(XN-1)/SPN-12   3-9
2. Indicator, Speed
ID-324(XN-1)/SPN-12   3-9
(c) Cabling ............................. 3-9
(d) Bonding ........................... 3-9
(8) Gyro Compass Synchro Amplifier
Mark 3 Mod. 1 ..................... 3-9
4. Protection of Exposed Units .................. 3-15
5. Cabling ......................................... 3-15
a. General Instructions ..................... 3-15
b. Cables ................................... 3-15
c. Cable Runs .............................. 3-16
d. Cable Entrances ........................ 3-16
e. Cable Protection ........................ 3-16
f. Cable Supports .......................... 3-16
g. Terminal Tubes ......................... 3-16
(1) General .............................. 3-16
(2) Packing Procedure for Multicon-
ductor Cables ...................... 3-16
(a) Special Preparation .............. 3-16
(b) Attachment to Unit or Bulk-
head ............................... 3-17
(c) Insertion of Cable ............... 3-17
(d) Retainer Packing ................. 3-17
(e) Sealing Packing .................. 3-17
(f) Final Retainer Packing ......... 3-17
(g) Gland Nut ........................ 3-17
(h) Plastic Sealer .................... 3-17
6. Tubing of Equipment ......................... 3-18
7. Check-up Following Installation ............. 3-18
a. Preliminary Inspection ................. 3-18
b. Calibration ............................. 3-18
8. Elimination of Interference ................... 3-18

## SECTION 4—OPERATION

*Paragraph*    Page

1. Introduction ................................... 4-1
2. Capabilities, Limitations and Precautions   4-1
a. Capabilities ............................. 4-1
b. Limitations ............................. 4-1
c. Precautions ............................. 4-1
(1) High Voltage Interlock ............ 4-1
(2) Space Heaters ..................... 4-1
(3) Blowers ........................... 4-1
(4) Magnetron ........................ 4-1
(5) Tracking Control Switch .......... 4-1
(6) Emergency Stop ................... 4-2
3. Starting Procedure ........................... 4-2
a. General ................................. 4-2
b. Applying Power ........................ 4-3
c. Adjustment of Good-Bad Circuit ...... 4-8
d. Starting Recorder Ink Flow .......... 4-13
e. Calibration Procedure ................. 4-13
(1) Relative Speed .................... 4-14
(2) True Air Speed ................... 4-16
4. Standby Condition ............................ 4-16
5. Operation ..................................... 4-16
a. General ................................. 4-16
b. Computer Operator's Checks and Ad-
justments .............................. 4-17
c. Tracking Operator's Procedure ....... 4-17
(1) Starting Adjustments ............. 4-17
(2) Operational Procedure ............ 4-17
d. Coordination of Operators ............ 4-18
e. Reading Speed Indicators ............. 4-18
f. Turning Off the Radar Set ........... 4-18
6. Summary of Operation ...................... 4-18
a. Blown Fuse Indicators ................ 4-18
b. Indicating Lights ...................... 4-19
c. Controls For Use of Technical Person-
nel Only .............................. 4-19
d. Cabinet CY-1103(XN-1)/SPN-12 .... 4-19
e. Test Procedures ....................... 4-19

## SECTION 5—OPERATOR'S MAINTENANCE

1. Routine Maintenance ........................ 5-0
a. General ................................. 5-0
b. Replacement of Recorder Chart ...... 5-3
c. Refilling Recorder Ink Supply ........ 5-3
2. Emergency Maintenance ..................... 5-3
a. General ................................. 5-3
b. Trouble Shooting Procedure .......... 5-3
c. Interlock Switch ....................... 5-11
d. Fuses .................................. 5-11

DECLASSIFIED
Authority NND974382

Reproduced from the Unclassified / Declassified Holdings of the National Archives

# TABLE OF CONTENTS—Continued

Paragraph | Page

e. Checking and Replacing Tubes ............. 5-11
  (1) Clasp Type Clamp ........................ 5-12
  (2) Miniature Tubes ......................... 5-12
  (3) Subminiature Tubes .................... 5-12
  (4) Magnetron ................................. 5-12

**SECTION 6—PREVENTIVE MAINTENANCE**

1. General ...................................... 6-1
   a. Importance of Preventive Maintenance 6-1
   b. Lubrication ............................... 6-3
   c. Contacts .................................. 6-3

2. Cleaning .................................... 6-6
   a. General .................................... 6-6
   b. Windows and Optical Gun Sight ....... 6-6
      (1) Glass ................................. 6-6
      (2) Plastic Windows ...................... 6-6
      (3) Optical Gun Sight .................... 6-6
   c. Air Cleaners .............................. 6-6
   d. High-Voltage Insulators ................. 6-6
   e. Tubes ..................................... 6-6
   f. Ferrule Resistors and Fuse .............. 6-6
   g. Interlock ................................. 6-6
   h. Relay Contacts ........................... 6-6
   i. Antenna Reflector ........................ 6-7
   j. Rust and Corrosion ...................... 6-7

3. Mechanical Check ........................... 6-7
   a. Terminal Strips .......................... 6-7
   b. Cables .................................... 6-7

4. Electrical Check ............................ 6-7
   a. Blown Fuse Indicators ................... 6-7
   b. Test Voltages and Waveforms ........... 6-7
   c. Set of Spare Tubes ...................... 6-7
   d. Inspection of Electrical Components.... 6-8
   e. Operating Controls ....................... 6-8

**SECTION 7—CORRECTIVE MAINTENANCE**

1. General ...................................... 7-1
2. Failure Report ............................... 7-1
3. Theory of Localization ...................... 7-1
   a. General .................................... 7-1
   b. Power ..................................... 7-1
   c. Waveforms ................................ 7-1
   d. Servicing Block Diagram ................. 7-1
   e. Front Panel Controls ..................... 7-1
4. System Trouble Shooting .................... 7-1

Paragraph | Page

5. Unit Trouble Shooting ...................... 7-8
   a. General .................................... 7-8
   b. Use of Unit Trouble Shooting Infor-
      mation ................................... 7-8
   c. Computer, Navigational
      CP-110(XN-1)/SPN-12 ................... 7-8
      (1) Frequency Standard ................... 7-8
      (2) Frequency Multiplier ................. 7-12
      (3) Filter Chassis ........................ 7-12
      (4) Limiter ............................... 7-17
      (5) Servo Amplifier ....................... 7-22
      (6) Low Voltage Power Supply ......... 7-27
   d. Power Supply PP-753(XN-1)/SPN-12 7-29
      (1) General ............................... 7-29
      (2) High Voltage Power Supply ........ 7-29
      (3) Magnetron Filament Current
          Supply ................................ 7-31
      (4) Magnetron Current Regulator .... 7-31
   e. Receiver-Transmitter, Radar
      RT-249(XN-1)/SPN-12 ................. 7-31
      (1) Magnetron ............................ 7-31
      (2) Video Amplifier ...................... 7-34
      (3) Crystal ............................... 7-34
   f. Synchro System ........................... 7-39

6. Repair ....................................... 7-39
   a. Crystal Current Adjustment ............. 7-39
   b. Adjustment of R1301 ................... 7-39
   c. Adjustment of R2209 ................... 7-40
   d. Adjustment of R109 ..................... 7-40
   e. Test Equipment .......................... 7-40
      (1) Tube Tester (TV-3/U Series) .... 7-40
      (2) Voltohmmeter (TS-352/U Series) 7-40
   f. Component Replacement ................. 7-40
      (1) Fuses ................................. 7-40
         (a) General ............................ 7-40
         (b) Fuse Maintenance ............... 7-40
      (2) Tubes ................................. 7-40
      (3) Capacitors ........................... 7-40
      (4) Resistors ............................. 7-41
      (5) Motors and Synchros ............... 7-41
   g. Special Procedures for Disassembly .... 7-41
      (1) General ............................... 7-41
      (2) Magnetron ............................ 7-41
      (3) Crystal ............................... 7-41
      (4) Video Amplifier ...................... 7-41

7. Maintenance Adjustments .................. 7-41

ORIGINAL

DECLASSIFIED
Authority NND974382

CONFIDENTIAL
INFORMATION

iii

Reproduced from the Unclassified / Declassified Holdings of the National Archives

**AN/SPN-12(XN-1)**
**INSTALLATION**

**CONFIDENTIAL**
**NAVSHIPS 91778(A)**

**Section 3**
**Paragraph 4**



**Figure 3-18. Gyro Compass Synchro Amplifier Mark 3 Mod. 1**
**Cable Entrances and Mounting Details**

## 4. PROTECTION OF EXPOSED UNITS.

All terminal tubes and cables should be carefully chromated and painted after installation to prevent corrosion.

## 5. CABLING.

### a. GENERAL INSTRUCTIONS.

Refer to the Interconnection Wiring Diagram (figure 3-19), and carefully follow all specifications as to the cable type.

Refer to figure 3-20 for Primary Power Distribution.

Use standard Navy armored cables for all inter-unit connections. Run all cables in accordance with standard Navy wiring practice.

Lug and number all individual conductors. Take care to prevent short circuits at terminal strips and jack assemblies. Remove insulation from conductors only far enough to make good soldered connections, and avoid dropping solder and wire clippings between terminals. Place a short piece of spaghetti tubing over the junction of each conductor where it enters the shank of the soldering lug. This will prevent frayed insulation, broken leads, and shorts between adjacent lugs. Check all jacks and plugs for tightness. Lace tightly into cables all leads terminating on terminal strips or on plug or jack assemblies.

Bond all external shielding (armor) at several points to the ship's common grounding strip to prevent or lessen interference between the Radar Set and other equipment.

The armor on the power cables should be grounded in accordance with "General Specifications for Machinery for Vessels of the U. S. Navy" (see S-62-2). The armor should be grounded to the ship's structure closely adjacent to the unit to which the cable connects, and also at several points along the cable length within the space, preferably at every other cable hanger. Grounding of armored steel cables should be done by cleaning the armor of the cable at the point where the securing clamp of the grounding device is fastened and grounding this clamp to the ship's structure with a strip of sheet steel which is 3/8" x 1/32". One end of the steel strip should be fastened with a securing clamp and the other end with machine screws to a suitable pad welded to the ship's structure.

### b. CABLES.

The cables listed below are multiconductor cables used in the system.

| Cable | Location of Cable |
|-------|-------------------|
| R-EC 1 | Power Supply to 115v, 60 cycle supply |
| R-EC 2 | Computer to Power Supply |
| R-EC 3 | Computer to Receiver-Transmitter |
| R-EC 4 | Power Supply to Receiver-Transmitter |
| R-EC 5 | Synchro Amplifier to Computer |
| R-EC 6 | Computer to L.S.O. Speed Indicator |
| R-EC 7 | Computer to C.C.A. Room Speed Indicator |
| R-EC 8 | Computer to Air Officer Speed Indicator |
| R-EC 9 | Computer to Wind Intensity Circuit |

DECLASSIFIED
Authority NND974382

Reproduced from the Unclassified / Declassified Holdings of the National Archives

Section 8
XV2202—E2311

CONFIDENTIAL
NAVSHIPS 91778(A)

AN/SPN-12(XN-1)
PARTS LIST

| TABLE 8-4 | | TABLE OF REPLACEABLE PARTS | |
|---|---|---|---|
| **REFERENCE DESIGNATION** | **STOCK NUMBER** | **NAME AND DESCRIPTION** | **LOCATING FUNCTION** |
| XV2202 | | SOCKET, ELECTRON TUBE: 8 contact octal; round excluding mounting flange; dim. excluding mounting and terminals 1-7/64 in. dia, 31/64 in. deep; mica filled bakelite body; mounted by moulded in plate w/two 5/32 in. dia holes located 1-1/2 in. c to c, 1-7/64 in. dia chassis hole required; American Phenolic Corp. MIP-8T; Same as XV1801 | For V2202 |
| XV2203 | | Same as XV2202 | For V2203 |
| XV2204 | | Same as XV2202 | For V2204 |
| XV2205 | | Same as XV2202 | For V2205 |
| C2301 | | CAPACITOR FIXED, ELECTROLYTIC: 1 section; 2000 mfd; 50V DC working; moisture proof plastic case; dim. 1-13/16 in. diam 4-3/8 in. lg; 2 solder lug terminals on one end; bracket for vertical mounting; polarized; P.R. Mallory Co., Inc. type HC-5020. | Filter |
| C2302 | | Same as C2301 | Filter |
| C2303 | | Same as C2301 | Filter |
| C2304 | | Same as C2301 | Filter |
| C2305 | | Same as C2301 | Filter |
| C2306 | | Same as C2301 | Filter |
| CR2301 | | RECTIFIER, METALLIC: selenium; designed for single phase full wave circuit MDCA Ref Dwg Group 23; input 78 v single phase; output 40-60 v, n amps max, full wave rectification; rectangular shape; dim. excluding mounting and terminals 4 in. square by 8-1/4 in. deep; two no. 5/16-18 thread by 5/8 in. lg mounting studs, one each end; 3 solder lug terminals located one side; Sarkes Tarzian Inc., D-33. | Filament supply rectifier |
| E2301 | ---- N17-B-77586-2571 ---- | TERMINAL BOARD: molded mica filled phenolic; 3 double screw type terminals; barrier type; over-all dim. 2-1/16 in. lg, 1-1/8 in. wide, 33/64 in. high; four 0.175 in. dia mounting holes on 1-3/4 in. by 7/16 in. mounting centers; Howard B. Jones, 3-141-0; Raytheon part #247-1015G3. | General use |
| E2302 thru E2311 | | NOT USED | |

DECLASSIFIED
Authority NND974382

CONFIDENTIAL

Reproduced from the Unclassified / Declassified Holdings of the National Archives

Section 8
S1005—X11001

CONFIDENTIAL
NAVSHIPS 91778(A)

AN/SPN-12(XN-1)
PARTS LIST

| TABLE 8-4 | | TABLE OF REPLACEABLE PARTS | |
|---|---|---|---|
| REFERENCE DESIGNATION | STOCK NUMBER | NAME AND DESCRIPTION | LOCATING FUNCTION |
| S1005 | ----<br>N17-S-72396-1763<br>---- | SWITCH, TOGGLE; JAN TYPE ST42E; single pole, double throw; rated 0.75 amp DC, 15 amp AC at 125v; Spec JAN-S-23; Catler Hammer Raytheon part #228-1001P5. | Good-bad switch |
| S1006 | | Same as S1001 | Local remote switch |
| S1007 | | Same as S1001 | MAN - AGC switch |
| T1001 | | TRANSFORMER, POWER, STEP DOWN: open metal frame; input 115v, 60 cycles, 1 phase; 1 output winding, 75v at 1.5 amp output; test v 1500 v rms; air cooled; permafil and varnish impregnated dim. 3-1/4 in. max lg, 3-1/8 in. max wide, 4-1/16 in. max high; 4 solder lug terminals, 2 on front, 2 on back; four 1/4 in. dia mounting holes on 2-7/16 in. by 1-5/8 in. mounting centers; electrostatic shielding; Raytheon part #292-1716G1. | Synchro zeroing voltage |
| TP1001 | | CONNECTOR, RECEPTACLE: 1 round female contact; straight type; over-all dim. 29/32 in. lg excluding terminals, 1/2 in. dia; cylindrical, brass barrel, bakelite top body; mts w/no. 5/16-32 thread by 3/4 in. lg on body; includes 2 washers and nut; Hugh H. Eby, #49. | Video input test point |
| TP1002 | | Same as TP1001 | Frequency multiplier output test point |
| XF1001 thru XF1003 | | NOT USED | |
| XF1004 | ----<br>N17-F-74267-6921<br>---- | HOLDER, FUSE: for one 1/4 in. x 1-1/4 in. or 9/32 in. x 1-1/4 in. glass fuse; molded bakelite body w/copper clips; 10 amp; o/a dimen 2-7/16 in. lg x 3/4 in. diam; marking of "FUSE" with arrow; Bussman Mfg. Co.; HCM; Raytheon part #343-1001P1. | For F1004 |
| XF1005 | | Same as XF1004 | For F1005 |
| XF1006 | | Same as XF1004 | For F1006 |
| X11001 | ----<br>N17-L-76656-2447<br>---- | LAMPHOLDER: single holder; accommodates miniature base lamp; rated 125 or 250v, 1/4 watt; brass body; over-all dim. 1-17/32 in. lg by 15/16 in. OD; 2 solder lug terminals; mounts w/no. 11/16-27 thread; includes built in resistor, washer, lockwasher and nut; Dial Light Corp.; 95408-93; Raytheon part #281-1017P1. | For I1001 |
| | | *Not furnished as a maintenance part. If failure occurs, do not request replacement unless the item cannot be repaired of fabricated. | |

DECLASSIFIED
Authority NND974382

TION

Reproduced from the Unclassified / Declassified Holdings of the National Archives

AN/SPN-12(XN-1)
PARTS LIST

CONFIDENTIAL
NAVSHIPS 91778(A)

Section 8
E1012—E1022

## TABLE 8-4 — TABLE OF REPLACEABLE PARTS

| REFERENCE DESIGNATION | STOCK NUMBER | NAME AND DESCRIPTION | LOCATING FUNCTION |
|---|---|---|---|
| E1012 | ---- N17-B-77988-3571 ---- | TERMINAL BOARD: black molded phenolic board; 12 double screw terminals; w/barriers; over-all dim. 6 in. lg, 1-1/8 in. wide, 33/64 in. deep; four 0.175 in. dia mounting holes on 5-11/16 in. by 7/16 in. mounting centers; Howard B. Jones, 12-141-0; Raytheon part #247-1005G12. | General use |
| E1013 | | Same as E1012 | General use |
| E1014 | | Same as E1012 | General use |
| E1015 | | TERMINAL BOARD: black moulded phenolic board; 8 double screw terminals; w/ barriers; over-all dim. 4-1/4 in. lg, 1-1/8 in. wide, 33/64 in. deep; four 0.175 in. dia mounting holes on 3-15/16 in. by 7/16 in. mounting centers; Howard B. Jones, 8-141-0; Raytheon part #247-1005G8. | General use |
| E1016 | | Same as E1015 | General use |
| E1017 | ---- N17-B-78039-6377 ---- | TERMINAL BOARD: black moulded phenolic board; 14 double screw terminals; w/ barriers; over-all dim. 6-7/8 in. lg, 1-1/8 in. wide, 33/64 in. deep; four 0.175 in. dia mounting holes on 6-9/16 in. by 7/16 in. mounting centers; Howard B. Jones, 14-141-0; Raytheon part #247-1005G14. | General use |
| E1018 | | Same as E1017 | General use |
| E1019 | | Same as E1017 | General use |
| E1020 | | Same as E1017 | General use |
| E1021 | * ---- N16-P-403502-904 ---- | PLATE, IDENTIFICATION: lapicoid, black; rectangular shape; 7-23/32 in. lg, 1-5/16 in. wide, 1/16 in. thick; four 13/64 in. dia mounting holes on 7-5/16 in. by 1/2 in. mounting centers; marked "E1001"; Raytheon part #8107305-159P1. | For E1001 |
| E1022 | * ---- N16-P-403502-206 ---- | PLATE, IDENTIFICATION: lapicoid, black; rectangular shape; 7-23/32 in. lg, 1-15/16 in. wide, 1/16 in. thick; four 13/64 in. dia mounting holes on 7-5/16 in. by 1/2 in. mounting centers; marked "E1002"; Raytheon part #8107305-161P1. | For E1002 |

*Not furnished as a maintenance part. If failure occurs, do not request replacement unless the item cannot be repaired or fabricated.

DECLASSIFIED
Authority NND974382

Reproduced from the Unclassified / Declassified Holdings of the National Archives

AN/SPN-12(XN-1)
INSTALLATION

**CONFIDENTIAL**
**NAVSHIPS 91778(A)**

Section 3
Paragraph 5 g (2) (a)

trance. This will make the entrance or passage water-tight when the tube is drawn up.

If a brass gland nut is used with armored cable, paint the armor with zinc chromate or a 2-to-1 mixture of zinc dust and petrolatum to prevent galvanic action.

#### (b) ATTACHMENT TO UNIT OR BULKHEAD.

Screw the neck of the tube into the unit or bulkhead and tighten securely with a wrench.

#### (c) INSERTION OF CABLE.

Slip the gland nut and gland ring onto the cable and insert the cable into the tube end until the armor just reaches the narrowest portion (beginning of the neck).

#### Note

All steel gland nuts should be zinc-plated.

#### (d) RETAINER PACKING.

With the gland nut and gland ring pulled back out of the way, insert one turn of retainer packing of the correct width to fill the space between the cable and the tube. Cut off the packing to overlap approximately 1/4". Tamp the packing firmly in place, using a wooden offset tamping tool or a plumber's caulking iron.

#### (e) SEALING PACKING.

Insert several turns of sealing packing of the correct width to fill the space, tamping each turn firmly in place. Use as many turns as necessary to fill the remaining depth of the tube, but leave just enough depth for one final turn of retainer packing. (If separate rings of sealing packing are used instead of one long piece, the overlaps should be staggered to avoid continuous cracks.)

#### (f) FINAL RETAINER PACKING.

Insert one turn of retainer packing, overlapping the ends approximately 1/4". If the cable is armored, use metallic retainer packing to ground the armor to the tube. Tamp the packing firmly until two threads are exposed on the inside of the tube. These are sufficient to start the gland nut without cross-threading.

#### (g) GLAND NUT.

Insert the metal gland ring. Carefully start the gland nut into the threads of the tube, avoiding cross-threading, then set it up tightly enough with a wrench to make a bond between the cable and the packing.

#### CAUTION

While the pressure thus developed within the tube will vary with the type of cable,

care must be taken not to apply a pressure great enough to damage the cable.

#### Note

When extra-flexible, rubber-covered cables are run through terminal tubes, one of the following special packings should be used:

(1) Split rings of soft, live rubber having a square cross section 1/4", 5/16", or 3/8", as required to fit the space between the cable and the tube. The ends of the rings should be skived and as many rings used as required to fill the packing space. The rubber may be obtained in helical form, if desired, and cut into rings as above.

(2) A long strip of soft, live rubber of circular cross section and of the proper diameter to fit the space between the cable and the tube applied in one continuous piece and wrapped spirally around the cable.

#### (b) PLASTIC SEALER.

After packing the tube and setting up the gland nut, fill the space between the cable and the tube with plastic sealer. This should be done both at the gland nut end and at the neck end (except, of course, on stuffing tubes and kick-pipes).

*1.* To ensure thorough application at the gland nut end, temporarily remove the gland nut and compression ring and apply sealer to the inner wall of the tube all the way from the final retainer packing to the mouth of the tube. Also, apply sealer to the inner surface of the gland nut and to the portion of cable normally covered by the gland nut. Then replace the gland ring and gland nut, tightening the latter as before.

*2.* In most cases, the neck end can be reached for sealing by working through the unit case, or the neck may be sealed after completing step (a).

(Plastic sealer is not used with extra-flexible, rubber-covered cables.)

#### Note

The type of plastic sealer to be used depends on the application.

a. Type HF sealer is used in high temperature compartments.

b. Type H sealer is used in locations subject to weathering.

c. Johns-Manville Duxeal is used where moisture and vermin must be excluded. As Duxeal does not flow readily at normal temperatures, it must be packed into place.

DECLASSIFIED
Authority NND974382

Reproduced from the Unclassified / Declassified Holdings of the National Archives

3 Section
Paragraph 5 c

**CONFIDENTIAL
NAVSHIPS 91778(A)**

AN/SPN-12(XN-1)
**INSTALLATION**

### c. CABLE RUNS.

In planning cabling installations, it is advisable first to sketch out the outline of each unit where it is to be mounted. This will facilitate finding the best cabling layout between the various units, and will also give some idea of how the completed installation will look.

In grouping cables, it is important to avoid layouts that might build up electrical disturbances or otherwise interfere with proper circuit performance. If avoidable, RF cables should not run parallel with other ship's cables. If unavoidable, a separation of 6" to 12" should be made.

Crossovers should be kept at a minimum. If unavoidable, they should be made in a shipshape fashion. All cables should be continuous between two units.

Unsightly cable bends can often be avoided at unit entrances by the use of 45° or 90° tubes and fittings.

All coaxial cables are fragile and must be handled with great care. Do not bend large coaxial cables on less than a 7" radius, or small cables on less than a 5" radius. Keep cables away from hot exhaust pipes, etc.

Sufficient slack should be left at entrances to permit the repair of cable ends without replacing the cables. In general, allow an extra foot or two of slack.

No splice connections are permitted, except where certain types of solid dielectric coaxial cables, where a splicing technique requiring the use of special molds is employed. Refer to R.I.P., pages C-6-35 through C-6-43 inclusive.

### d. CABLE ENTRANCES.

Entrance to watertight units must be made with standard Navy terminal tubes. Threaded entrances should be coated with anti-seize compound (such as a 2-to-1 mixture of petrolatum and zinc dust) before installing the tube. Entrance to non-watertight units is preferably made through terminal tubes. These need not be packed watertight, but should be packed sufficiently to anchor the cables in place. In general, where alternate cable entrances are provided, entrance from the top is preferable; entrance from the side or bottom is permissible as second and third choice.

Passage of cables through decks and bulkheads exposed to weather must be made with stuffing tubes.

### e. CABLE PROTECTION.

Wherever cables are liable to mechanical injury, they must be protected by suitable metal casing. All cables passing through decks must be protected by means of kick-pipes or riser-boxes.

Cables subjected to frequent or occasional immersion in water must be installed as high as possible. In such places, the cables should be coated with a paint resistant to water, oil, and acid and should be so located as to be accessible for subsequent repainting.

All armored cables should be given a coat of zinc chromate before paint is applied. Cables exposed to the weather should be painted at regular intervals.

### f. CABLE SUPPORTS.

Cable supports should be designed to secure cables without damage to armor or insulation, and should be formed to make uniform contact with at least 1/2" of the cable circumference.

Coaxial cables should be secured with double-toe, loose-fitting straps. These should be snug but not too tight, since compression of the dielectric between the inner and outer conductors will lower the voltage breakdown point.

Where cables pass through non-watertight bulkheads or beams, a suitable bushing may be substituted which will permit the cable to be drawn through without damage. In cases where the thickness of the bulkhead or webbing is 1/4" or more, the bushing may be omitted but the edges of the holes must be rounded.

### g. TERMINAL TUBES.

#### (1) GENERAL.

To ensure long, trouble-free service, all terminal tubes must be carefully packed as outlined below. Defective packing is a common cause of equipment failure.

#### (2) PACKING PROCEDURE FOR MULTICONDUCTOR CABLES.

The procedure given below applies for packing either terminal tubes or stuffing tubes with either armored or unarmored multiconductor cables. (Slight differences in procedure for the two types of cables are noted.)

With all multiconductor cables, it is standard practice to use retainer packing for the first and last layers and sealing packing to fill the space between these layers. Plastic sealer is applied to both ends of terminal tubes to seal the space between the cable sheath and the inner wall of the tube.

##### (a) SPECIAL PREPARATION.

If convenient at the time, apply plastic sealer between the cable and the neck of the tube, as outlined in step (b); or, if desired, leave this to be done later after the tube has been attached to the unit and packed.

If the tube is to be attached to a watertight unit or bulkhead, apply anti-seize compound or other non-corrosive material to the outside threads on the neck of the tube and the inside threads of the unit en-

**CONFIDENTIAL
SECURITY INFORMATION**
DECLASSIFIED
Authority NND974382

Reproduced from the Unclassified / Declassified Holdings of the National Archives

## TABLE 8-4  COMBINED PARTS AND SPARE PARTS LIST

| STAND. DESIGNATION | NAME OF PART AND DESCRIPTION | FUNCTION | JAN OR NAVY TYPE DESIGNATION | STANDARD NAVY STOCK NUMBER | MFR. | MFR'S DESIG. | CONTRACTOR'S PART NUMBER | ALL STANDARD DESIGNATIONS INVOLVED | TOTAL PER EQUIP |
|---|---|---|---|---|---|---|---|---|---|
| 0-1322 | GASKET: "O" ring hydraulic packing; syn rubber; single hole; round; 3-7/8" OD x 1/8 ID x 1/8" thk; ANA std AN6230. | Gasket between rotary joint housing and RF input flange | AN6230-17 | N17-G-161586-390 | 719 | △ | 287-1005P17 | 0-1322 | 1 |
| 0-1323 | GASKET: "O" ring hydraulic packing syn rubber; single hole; round; 4-7/8" OD x 4-5/8" ID x 1/8" thk; ANA std AN6230. | Gasket between B1M01 motor mount & upper pedestal half | AN6230-25 | N17-G-163041-991 | 719 | △ | 287-1005P25 | 0-1323 | 1 |
| 0-1324 | GASKET: "O" ring hydraulic syn-thetic rubber; single hole; round, 7-1/4" OD x 7" ID x 1/8" thk; ANA std AN6230-40. | Gasket between bottom bearing retainer & selector valve housing | AN6230-40 | N17-G-164016-551 | 719 | AN6230-40 | 287-1005P40 | 0-1324 | 1 |
| 0-1325 | GASKET: "O" hydraulic packing; syn rubber; single hole; round, 7-1/2" OD x 7-1/4" ID x 1/8" thk; ANA std AN6230. | Gasket 2 between spindle tube assy & upper pedestal half | AN6230-41 | N15-G-164109-120 | 719 | △ | 287-1005P41 | 0-1325 | 2 |
| 0-1326 | GASKET: "O" ring hydraulic packing syn rubber; single hole; round; 9-3/4" OD x 9-1/2" ID x 1/8" thk; ANA std AN6230. | Gasket between upper & lower housings of rotary joint 0-1315 | AN6230-50 | N17-G-164659-550 | 719 | △ | 287-1005P50 | 0-1326 | 1 |
| 0-1327 | SEAL, oil: bearing seal; lip matl molded compound, heal asbestos, garter spring steel and oil round; 5/8" thk; n/a single hole; endless. N/o O-1315 | Between "G" curve & RF input flange of rotary joint 0-1315 | | N16-B-150143-344 | 743 | 4374 | 287-1030P1 | 0-1327 | 1 |
| 0-1328 | SEAL, oil: bearing seal; lip matl molded compound, heal asbestos, garter spring steel; ID x 7/16" thk n/a single hole; endless. | At bottom of spindle tube | | N16-B-150143-342 | 743 | 4169 | 281-1030P2 | 0-1328 | 1 |
| 0-1329 | SEAL, oil: bearing seal; lip matl molded compound, heal asbestos, garter spring steel; round; 4-7/8" OD x 5-1/4" ID x 7/16" thk n/a single hole; endless. | For upper spindle bearing | | N16-B-150143-343 | 743 | 3727 | 287-1030P3 | 0-1329 | 1 |
| 0-1330 | SEAL, oil bearing seal; lip matl molded compound, heal asbestos; garter spring steel; round; "P" OD x 6" ID x 7/16 thk n/a single hole; endless. | Washer seal in the reflector bracket adaptor | | N16-B-150143-340 | 743 | 3714 | 287-1030P4 | 0-1330 | 1 |
| 0-1331 | GASKET: drain pipe; neoprene; single hole; round, 1-3/8" OD x 1-1/16" ID x 1/4" thk n/a. | Drain pipe gasket | AN721-0-161225-135 | AN721-G-161225-135 | 26 | △△ | 287-1021P1 | 0-1331 | 1 |

△ Same as JAN or Navy Type Number.
△△ Same as Contractor's Part Number.
* When equipment spares are expended the hot repair replacements if this item should be fabrication if additional parts are required.

† FOR NAMES AND ADDRESSES, SEE LIST OF MANUFACTURERS

EXHIBIT E

Reproduced from the Unclassified / Declassified Holdings of the National Archives

$60-A-1971$
$96$

# CVA 62

# SHIP INSTRUMENTATION
# MANUAL

**WARNING:** This document contains information affecting the national defense of the United States within the meaning of the Espionage Laws, Title 18, U.S.C., Sections 793 and 794. The transmission or the revelation of its contents in any manner to an unauthorized person is prohibited by law.

NEW YORK NAVAL SHIPYARD
BROOKLYN 1, NEW YORK

DEPARTMENT OF THE NAVY — BUREAU OF SHIPS — DECEMBER, 1958

DECLASSIFIED

6240566-59

Reproduced from the Unclassified / Declassified Holdings of the National Archives

TABLE OF CONTENTS

CHAPTER 1 — ARRANGEMENT AND INSTRUMENTATION OF SHIPBOARD SPACES

Section     Page

| 1. | Pilot House | 1-1-1 |
| 2. | Combat Information Center | 1-2-1 |
| 3. | Chart House | 1-3-1 |
| 4. | Captain's Plot | 1-4-1 |
| 5. | Flag Tactical Plot | 1-5-1 |
| 6. | Atomic Strike Control | 1-6-1 |
| 7. | Flag Bridge | 1-7-1 |
| 8. | Air Operations | 1-8-1 |
| 9. | Primary Fly Control Station | 1-9-1 |
| 10. | Secondary Fly Control Station | 1-10-1 |
| 11. | Carrier Controlled Approach Room | 1-11-1 |
| 12. | Landing Signal Officer's Station | 1-12-1 |
| 13. | Central Control Station | 1-13-1 |
| 14. | Secondary Conning Station | 1-14-1 |
| 15. | Air Defense Stations | 1-15-1 |
| 16. | Interior Communications and Gyro Rooms | 1-16-1 |
| 17. | Main Battery Plotting Room | 1-17-1 |

CHAPTER 2 — RADIO COMMUNICATIONS

| 1. | General Description | 2-1-1 |
| 2. | Radiophone Circuits | 2-2-1 |
| 3. | Radio Telegraph Circuits | 2-3-1 |
| 4. | Radio Teletype Circuits | 2-4-1 |
| 5. | Radio Circuit Distribution | 2-5-1 |
| 6. | Communications Console Systems | 2-6-1 |
| 7. | Omnidirectional UHF Radio Installation | 2-7-1 |

CHAPTER 3 — RADAR, IFF, AND ECM SYSTEMS

| 1. | General Description | 3-1-1 |
| 2. | Search Radar | 3-2-1 |
| 3. | Radar IFF Systems | 3-3-1 |
| 4. | Radar Indicators | 3-4-1 |
| 5. | CCA Radar Group | 3-5-1 |
| 6. | Radar Dead Reckoning And Own Ship's Course Systems | 3-6-1 |
| 7. | ECM Systems | 3-7-1 |

CHAPTER 4 — MISCELLANEOUS ELECTRONICS

| 1. | General Description | 4-1-1 |
| 2. | Navigational Aids | 4-2-1 |
| 3. | Infrared Communication System | 4-3-1 |
| 4. | Meteorological Equipment | 4-4-1 |

DECLASSIFIED

DECLASSIFIED

## TABLE OF CONTENTS (Continued)

### CHAPTER 5 — INTERIOR COMMUNICATION SYSTEMS

Section | | Page
--- | --- | ---
1. | General Description | 5-1-1
2. | Ship Control Metering and Indicating Systems | 5-2-1
3. | Ship Control Order Systems | 5-3-1
4. | Ship Control Alarm and Signal Systems | 5-4-1
5. | Flight Control Systems | 5-5-1

### CHAPTER 6 — TELEPHONE AND INTERIOR MESSAGE FACILITIES

1. | General Description | 6-1-1
2. | Telephone Systems | 6-2-1
3. | Announcing Systems | 6-3-1
4. | Interior Teletype Systems | 6-4-1
5. | Communications Console Systems | 6-5-1
6. | Message-Passing Facilities | 6-6-1

### CHAPTER 7 — FIRE CONTROL SYSTEMS

1. | General Description | 7-1-1
2. | Fire Control Systems | 7-2-1
3. | Target Designation Systems | 7-3-1

Reproduced from the Unclassified / Declassified Holdings of the National Archives

Reproduced from the Unclassified / Declassified Holdings of the National Archives

# SHIP INSTRUMENTATION MANUAL

# Chapter 3

## RADAR, IFF, AND ECM SYSTEMS

LIST OF SECTIONS                                                    PAGE NO.

    1.    General Description                                3-1-1

    2.    Search Radar                                      3-2-1

    3.    Radar IFF Systems                                 3-3-1

    4.    Radar Indicators                                 3-4-1

    5.    CCA Radar Group                                  3-5-1

    6.    Radar Dead Reckoning and Own-Ship's Course System    3-6-1

    7.    ECM Systems                                      3-7-1


LIST OF ILLUSTRATIONS                                              PAGE NO.

    3-1-1.    Starboard Profile Showing Radar Antenna Locations    3-1-1

    3-6-1.    Radar Own-Ship's Course Distribution System    3-6-2

DECLASSIFIED